DEPARTMENT OF REVENUE, Petitioner-Appellant, v. STER-
LING CUSTOM HOMES CORPORATION, Respondent.

Supreme Court

*No. 77-030. Submitted on briefs September 12, 1979.*
*—Decided October 9, 1979.*
(Also reported in 283 N.W.2d 573.)

For the appellant the cause was submitted on the brief
of *Bronson C. La Follette,* attorney general, and *John E.
Armstrong,* assistant attorney general.

For the respondent the cause was submitted on the
brief of *Boardman, Suhr, Curry & Field,* attorneys,
*James F. Lorimer,* of counsel, *Thomas G. Ragatz* of

*Foley & Lardner*, of counsel, all of Madison, and *Thomas A. Schuessler*, of counsel, Fond du Lac.

HEFFERNAN, J.   The only question on this appeal is whether the taxpayer, Sterling Custom Homes Corporation, a maker of unique custom-designed homes, is, under the facts of this case, a contractor engaged in real property construction activities and a consumer of tangible personal property within the meaning of sec. 77.51 (4) (i) [1] and 77.51 (18), Stats. [2]

We conclude that, under the statutes, Sterling Homes was a contractor and a consumer of personal property; and, accordingly, the sales tax was to be levied upon the transfer of materials to Sterling Homes. We affirm the judgment of the trial court.

The litigation arises out of the assessment of certain sales taxes levied by the Wisconsin Department of Revenue upon Sterling Homes between December 1, 1969, and August 31, 1974. A petition filed by Sterling Homes for redetermination and refund of these taxes was denied by the Department. The Department's action was reversed by the Wisconsin Tax Appeals Commission; and, on appeal by the Department pursuant to ch. 227, Stats., the

[1] "(i) Sales of building materials, supplies and equipment to owners, contractors, subcontractors or builders for the erection of buildings or structures or the alteration, repair or improvement of real property. Such transactions are deemed retail sales in whatsoever quantity sold."

[2] "(18) 'Contractors' and 'subcontractors' are the consumers of tangible personal property used by them in real property construction activities and the sales and use tax applies to the sale of tangible personal property to them. A contractor engaged primarily in real property construction activities may use resale certificates only with respect to purchases of property which he has sound reason to believe he will sell to customers for whom he will not perform real property construction activities involving the use of such property."

circuit court affirmed the Tax Appeals Commission's decision and entered judgment, which had the effect of finding that transfers made by Sterling Homes were not taxable.

In reaching our conclusion that Sterling Homes was a contractor and a consumer of the goods, we look to the general scope of its activities in its home-construction enterprise. The facts are undisputed. Accordingly, only a question of law is presented on this appeal.

During the period for which the taxpayer claimed refund, it was in the business of prefabricating custom-designed homes, which ranged in price from $20,000 to $200,000. The homes sold in Wisconsin were prefabricated at the taxpayer's Fond du Lac, Wisconsin, plant. The taxpayer marketed homes through regional managers, who sold the prefabricated homes to local builders. The taxpayer's sales agreements were with these builders and not the ultimate home owners. The builders executed separate agreements with the home owners and determined the eventual price to be charged for the finished homes. The design process was usually initiated by the builder or a prospective home owner, who came to the taxpayer with rough sketches and ideas for the taxpayer to incorporate into formal sales drawings. Once a sales drawing was satisfactory, the builder and sometimes the home owner specified in detail the materials that were to be incorporated into the house. The taxpayer and the builder then completed a specification sheet, which detailed and priced every portion of the house. After that agreement was reached, the taxpayer prepared and supplied the builder with detailed plans for the house foundation. Although the builder was responsible for the actual installation of the foundation, the taxpayer coordinated its foundation plans with its prefabricated components to insure that the prefabricated house fit the foundation properly.

The taxpayer prided itself on building unique custom-designed houses, rather than mass producing stock models. The components of any one house prefabricated by the taxpayer were unique and were not interchangeable with the components of any other house built by the taxpayer. The record makes clear that the prefabricated components were only useful in the construction of the particular house for which Sterling Homes and the builder contracted. Sterling Homes did not maintain an inventory of either individual components or of completed house packages.

The taxpayer prefabricated each house at its plant in Fond du Lac in a regular sequence. It first built the wall sections, then the deck and floor sections, the roof, and finally the interior and trim. The house packages fabricated by Sterling Homes did not include "mechanicals," such as plumbing, wiring, heating, and drywall. The builders hired subcontractors to perform that work.

When the foundation was completed and the builder was ready to erect the house, the taxpayer loaded the components in the sequence that conformed to the order that the components would be used at the job site. The components were delivered to the job site by the taxpayer's trucks and drivers. At the job site, the larger components were unloaded by crane. The crane operators were hired by the builder, but were usually selected by one of the taxpayer's salesmen. The smaller components, such as trim, were unloaded by the taxpayer's employees and were placed in the portion of the house where they would be installed. Although the drivers' only defined on-site responsibility was to keep a report in respect to the erection, they often helped or supervised, because they were very familiar with the process. There was evidence that they "probably know more about putting a package together than any builder . . . because this is all they do. Every day they erect another house." The driv-

ers have basic carpentry knowledge and are able to read a blueprint. Although the actual erection ordinarily took but one day, if the house did not go up smoothly, the drivers were required to spend additional time at the site.

The taxability of the transaction transferring the components to the builder is dependent upon whether Sterling Homes was engaged in "real property construction activities." If Sterling Homes was engaged in such an activity, then it is a contractor or a subcontractor and is a consumer of the tangible personal property used in real property construction activities, and the sales tax applies to transfers to Sterling Homes and not by it.

This court pointed out in *Family Hospital Nursing Home, Inc. v. Milwaukee,* 78 Wis.2d 312, 319, 254 N.W. 2d 268 (1977), that, where an organizational structure and a method of operation of an institution claiming exemption is in issue, this court would make the determination on the basis of the facts viewed as a whole—that it is the substance and realities of a taxpayer's activities that are determinative of the Department's power to tax.

The facts demonstrate that, in all respects but one, the taxpayer was engaged in real property construction activities. The lone exception is that Sterling Homes conducted its construction activities at a factory, rather than at the building site. The taxpayer used the matrials it purchased for only a single purpose—to construct custom-designed houses to be assembled at predetermined locations on foundations which were specifically designed for the prefabricated components. The components thus assembled were consumed by the very process of fabrication, for they would be useless in their fabricated form except for the very building for which designed.

The taxpayer's employees, like ordinary builders, were generally members of the Carpenters and Joiners Union.

Additionally, the taxpayer was substantially involved in the on-site erection process. It was the taxpayer who designed the building and the components for the particular site. It determined the order in which the components were manufactured and loaded, and thereby dictated the assembly sequence. Because the taxpayer furnished the builder with detailed erection plans, it determined the manner in which the houses were erected. While the drivers had no responsibility to erect the houses, they were required to stay at the job sites, even after the trucks were unloaded, to make sure that the houses went up properly. As the trial court appropriately noted:

"Years ago, Sterling could have performed its work only by bringing its materials and tools to the job site. New materials, tools and skills now make possible Sterling's method of construction."

Had Sterling performed its functions on the job site, no question would arise in respect to the taxability of the transfer of components built there for assembling on the foundation.

The distinction between on-site and off-site construction of the components is not a criterion upon which the legislature has hinged the question of taxability. Rather, taxability is to be determined by whether or not the taxpayer is engaged in "real property construction activities." The record leaves no doubt that Sterling Homes was so engaged. The use Sterling Homes made of the building materials was directed exclusively to the construction of custom-designed parts for a designated house which was to be assembled at a particular location. The work of the taxpayer in preparing these components was unmistakably construction activity directly related to the erection of a particular building. This is demonstrated by Sterling Homes' involvement in the on-site assembly and erection of the house. As the trial court correctly stated:

"It is unrealistic to attempt to segregate Sterling's activities at Fond du Lac in constructing sections or component parts of a house from the limited on-site activities of its drivers with respect to the erection of the house."

It is apparent that the legislature has clearly exempted from the sales tax sales by persons engaged in real property construction activities. The Department of Revenue would have us engraft upon that clear exemption the additional proviso that real property construction activities must consist exclusively of activities on the building site. Nothing in the sales tax statutes reasonably leads to that conclusion. The Department's contention would result in the levying of a tax upon an off-site prefabricator, but not upon a prefabricator who did its work on the job site. There is no evidence whatsoever that such discrimination was intended. Sec. 77.51(18), Stats., does not make that distinction.

For purposes of the sales tax, Sterling Homes was the ultimate consumer of the materials utilized in its component parts, for, at that stage of construction, the fabricated parts could be dedicated to but one purpose—the construction and erection of a specific building. In reaching this conclusion, we do not consider the additional rationale employed by the trial court, *i.e.*, that, upon the custom prefabrication of the component parts, the materials were so dedicated to a particular portion of the building that they were in effect fixtures and, hence, real estate not taxable under the sales tax laws. We make no determination in respect thereto. It is sufficient for the purposes of this case to hold that Sterling Homes was engaged in real property construction activities and, in respect to the sale of these components, specifically exempt from taxation.

*By the Court.*—Judgment affirmed.