MADISON NEWSPAPERS, INC., Petitioner-Appellant,

v.

WISCONSIN DEPARTMENT OF REVENUE, Respondent-Respondent.

Court of Appeals

*No. 98–2980. Submitted on briefs April 13, 1999.—Decided June 10, 1999.*

(Also reported in 599 N.W.2d 51.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Bernard J. Powers* at *Capwell, Nolden, Kallenbach & Grahovac, S.C.* of Racine.

On behalf of the respondent-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *F. Thomas Creeron, III*, assistant attorney general.

Before Dykman, P.J., Vergeront and Deininger, JJ.

DYKMAN, P.J. Madison Newspapers, Inc., appeals from an order affirming the Wisconsin Tax Appeals Commission's decision that the packaging and shipping materials it uses when distributing newspapers to its carriers are not exempt from the sales and use tax imposed on retailers under § 77.52, STATS. The commission and the court both held that the materials were not exempt because the carriers did not qualify as "customers" under § 77.54(6)(b), STATS.[1] MNI argues that because the carriers entered into an agreement to

---

[1] Section 77.54, STATS., reads in pertinent part as follows:

There are exempted from the taxes imposed by this subchapter:

. . . .

purchase newspapers from MNI to resell to subscribers, they qualify as MNI's customers. We disagree and affirm.

## BACKGROUND

### A. *Procedural History*

Madison Newspapers, Inc. (MNI), produces and distributes two newspapers, the *Wisconsin State Journal* and *The Capital Times*. On June 28, 1995, the Wisconsin Department of Revenue (DOR) issued a sales and use tax assessment against MNI for the period of October 1, 1989, through September 30, 1993. MNI filed a timely petition for a redetermination, which DOR granted in part and denied in part. MNI then timely filed its petition for review with the Wisconsin Tax Appeals Commission. The commission's findings in this case are supported by substantial evidence in the record and are therefore controlling in our analysis. *See* § 227.57(6), STATS.[2] Several of those findings will be set forth throughout the opinion.

(6) The gross receipts from the sale of and the storage, use or other consumption of:

. . . .

(b) Containers, labels, sacks, cans, boxes, drums, bags or other packaging and shipping materials for use in packing, packaging or shipping tangible personal property, if such items are used by the purchaser to transfer merchandise to customers and meat casing, wrapping paper, tape, containers, labels, sacks, cans, boxes, drums, bags or other packaging and shipping materials for use in packing, packaging or shipping meat or meat products regardless of whether such items are used to transfer merchandise to customers.

[2] The commission's findings and conclusions are set out in *Madison Newspapers, Inc. v. DOR*, St. Tax Rep. (CCH) 400–342 (Wis. Tax App. Comm'n 1998).

When MNI distributed its newspapers to its carriers, it bundled them using string, strap and other wrapping and packaging materials. After receiving the newspaper bundles, the carriers would remove and discard the packaging materials before delivering the newspapers to subscribers. It is the tax DOR assessed on these packaging materials that is in dispute.

B. *Route Carrier Agreement*

MNI entered into a "route carrier agreement" with all of its carriers. The pertinent portions of that agreement are as follows:

> I offer to sell and distribute The Wisconsin State Journal daily and Sunday as an independent contractor for Madison Newspapers, Inc., the Publisher, subject to the attached terms and conditions.
>
> . . . .
> TERMS AND CONDITIONS
> 1. BUYING NEWSPAPERS AT WHOLESALE. I agree to purchase from the Publisher [MNI] the number of newspapers which my route requires. I will pay for those newspapers at the wholesale rates set by the Publisher upon receipt of my billing from the Publisher.
> 2. SERVICE. I agree to arrange for sale and delivery of the newspapers to the customers on my route promptly, regularly, and to the reasonable satisfaction of the customers. I understand that the Publisher may accept and refer to me service requests from customers. I retain complete control over all means, methods, and equipment that I might use to service my route.
> 3. SUBSTITUTES. If I do not service my route in person, I shall provide a qualified substitute who has met all of the requirements of any

applicable street trades law, including having on file with the Publisher a Street Trades Permit for any substitute who is under 18 years of age. I agree to use no substitute under the age of 18 years as a driver on a motor route. I agree that this contract cannot be assigned without the consent of the Publisher.

4. EXPENSES AND EQUIPMENT. I understand that I will service my route at my own expense and risk. I will provide any equipment that I may need. I understand I have no right of reimbursement from the Publisher for expenses incurred in connection with my route.

5. COLLECTIONS AND CREDIT LOSSES. I understand that I am in charge of my own collections and that the Publisher is not required to reimburse me for any credit losses which I may sustain. I understand that some of my customers may prefer to make an advance deposit with the Publisher. I agree that the Publisher may accept such deposits for me and keep individual records of those accounts. The Publisher will then credit my account regularly until the deposits are consumed. In the event of termination, I will pay to the carrier succeeding me or to the Publisher, all money collected by me from my customers in advance of my termination date and I understand that the remainder of any advance deposits held by the Publisher will be credited to my successor.

6. ROUTE LIST. I understand that from time to time the Publisher may request a list of my customers. I agree to provide such a list promptly upon request.

7. ROUTE CHANGE. If my route changes so that I cannot give proper service, a change of my route may be negotiated with the Publisher by an agreement in writing, and any person guaranteeing this agreement agrees that such change shall not

751

affect or release the obligation as the Guarantor or require his approval or signature.

8. TERMINATION. I reserve for myself and grant the Publisher the right to terminate this agreement for any reason, at any time, on 30 days written notice in advance of the termination, except that between December 1 and December 31 of each year, 60 days notice is required. In addition, either party may terminate this agreement with no notice if the other party breaks any of the terms of this agreement. Upon termination, I agree to deliver to the Publisher a complete and accurate record of all accounts with the customers on my route on cards which the Publisher will furnish.

9. BONDING. I understand that the Publisher may obtain bond coverage on me. I agree to cooperate with the Publisher's attempt to obtain such coverage and to promptly file any forms which the bonding company may require.

While MNI and its carriers generally adhered to the route carrier's agreement, they often negotiated changes subsequent to entering into the agreement.

## C. *Billing, Collections and Rates*

Carriers were in charge of their own collections with the understanding that some of the subscribers might prefer to pay MNI in advance. Over ninety percent of MNI's subscribers made their payments directly to MNI and were referred to as "office pay subscribers." The rest of the subscribers paid their carriers and were referred to as "carrier-collect subscribers." Carriers had no control over whether a subscriber paid them or paid MNI directly. Moreover, if a subscriber paid MNI in advance for subscriptions, MNI treated these funds as its own and not funds held in trust for carriers. It

typically invested these funds in interest-bearing accounts and retained any resulting interest.

MNI maintained a central billing system to bill subscribers, collect subscription payments, and credit carriers for amounts it received from subscribers on that carrier's route. MNI regularly sent its carriers a billing statement that detailed that carrier's activity. The statement listed under the heading "Total Charges For Papers You Bought," the carrier's account at a wholesale rate for newspapers he or she delivered to subscribers on his or her route. Under the heading "Money Received From Your Customers Who Paid At The Office," the billing statement listed the amounts MNI had credited to the carrier's account for payments made by office-pay subscribers to MNI. After accounting for miscellaneous credits and charges, the billing statement would list a net amount due the carrier.

In almost every case, MNI would set the wholesale rate carriers would pay for newspapers, and it would unilaterally set the retail rate charged to office-pay subscribers. Carriers rarely charged their carrier-collect subscribers a rate different from the one MNI set for its office-pay subscribers.

D. *Expenses and Risk*

MNI paid a subsidy, in the form of a separate credit, to all carriers on routes requiring a motor vehicle. This subsidy significantly reduced or eliminated the transportation expenses for these carriers. MNI also subsidized routes with a lower-than-average concentration of subscribers. However, MNI typically set this subsidy without consulting the carrier.

If a subscription lapsed, MNI would typically credit carriers for papers delivered but not paid for by subscribers. MNI would guarantee credit for two weeks

of newspapers delivered but not paid for by a carrier-collect subscriber. But if the lapse was longer than two weeks, MNI generally would hold the carrier responsible for any resulting loss.

When office-pay subscribers failed to renew their subscriptions on time, MNI continued to pay its carriers the retail rate for ten days in the hopes that the subscriber would renew the subscription. However, if the subscriber did not renew the subscription, MNI would credit the carrier for the newspapers delivered but not paid for by the subscriber. When an office-pay subscriber failed to renew a subscription, the carrier might not be made aware of this fact until after the ten-day grace period expired, and MNI issued the carrier a notice to stop delivery. Similarly, a carrier would first learn that a new office-pay subscriber was added to the route when a start notice was sent along with the bundle of newspapers informing the carrier that he or she was expected to serve the new subscriber that day. When an office-pay subscriber started up a subscription and did not pay in advance, MNI would maintain the subscription for twenty-four to twenty-eight days. If the subscriber failed to pay for the subscription, the carrier would be credited for the newspapers delivered but not paid for by the subscriber. The commission concluded that MNI's policy of providing credit (within certain limits) to all carriers for newspapers delivered but not paid for greatly reduced the risk of credit loss by carriers.

MNI would also offer subscribers a discounted rate if they paid for a year in advance. Even though these subscribers were paying a reduced rate, MNI credited that subscriber's carrier the full retail price of newspapers delivered.

754

In addition, MNI provided a missed delivery service for subscribers in the Madison area. Under this system, if a carrier failed to deliver a newspaper to a subscriber or delivered a defective newspaper, an MNI employee would deliver a paper to that subscriber without charging the carrier or the subscriber. If a carrier outside of Madison received insufficient or damaged newspapers, or if a subscriber complained to MNI that he or she did not receive a newspaper, the carrier could purchase a newspaper from a local retailer and MNI would reimburse the carrier for the cost of the newspaper, regardless of fault.

MNI also provided a complimentary route bag for carrying newspapers and a hundred plastic sleeves to cover the newspapers during inclement weather. MNI charged carriers for additional purchases of plastic sleeves and route bags. Carriers also had to pay for rubber bands and sleeves and, depending on the carrier's situation, the carrier might have to pay for assistants, substitutes, and transportation.

## E. *Establishing and Overseeing Routes*

MNI divided its home delivery area into routes, and carriers were assigned to serve one or more of these predetermined routes. MNI generally would not permit carriers to deliver to subscribers outside of these routes. As subscriptions increased in an area, MNI would often divide the route into two or more routes so that the subscribers could be served within acceptable time limits. If a carrier recruited a new subscriber on another carrier's route, the other carrier would almost always serve that new subscriber. On rare occasions, if the new subscriber lived close to the recruiting carrier's route, MNI would permit the recruiting carrier to serve the new subscriber. Occa-

sionally, MNI would move a subscriber from one carrier's route to another carrier's route on the basis of complaints by that subscriber. However, carriers were not able to drop an office-pay subscriber from his or her route, even if they did not get along or were otherwise in conflict.

When a new carrier took over a route that had carrier-collect subscribers, MNI would audit the departing carrier's records. MNI would ensure that subscription payments by carrier-collect subscribers made prior to the changeover were paid to the new carrier, and that the subscriber received proper credit for amounts prepaid. When carriers solicited new subscriptions, they were instructed to have new subscribers make their checks payable to MNI.

Carriers were expected to deliver newspapers within set delivery deadlines. If a carrier consistently missed deadlines, MNI could terminate his or her contract. Each carrier could arrange to have other persons assist on the route and was expected to find a substitute when the carrier was unable to complete the route. Each carrier was responsible for any compensation paid to a substitute or assistant. When a carrier could not serve the route and could not find a substitute, MNI would serve the route until the carrier or a substitute could return to the route. MNI, however, would charge the carrier for the cost of serving the route.

On occasion, MNI would send out questionnaires to subscribers to determine the quality of service that its carriers were providing. MNI also would monitor carriers to make sure the carriers were properly serving their routes, regardless of whether any complaint had been made. Invoices sent to subscribers by MNI's central billing system told the subscriber to call MNI with any complaints.

After making these findings, the commission determined that MNI's purchase of packaging materials was not exempt from the sales and use tax, because the bundles of newspapers on which the packaging material was used were transferred to carriers who were not MNI's "customers" within the meaning of § 77.54(6)(b), STATS. The commission looked to the route carrier agreement as well as other documents, and concluded that MNI's relationship with its carriers was more like principal-agent than wholesaler-retailer. It concluded that MNI protected the carriers in several respects from the risk of loss associated with the sale of newspapers; it paid a portion of the carrier's transportation costs and the entire cost of promotion; it assumed the responsibility of billing subscribers; and for over ninety-percent of the subscribers, it took responsibility for collecting payments. It also retained great control over how and when the carriers would deliver the newspapers. The circuit court affirmed. MNI appeals.

## STANDARD OF REVIEW

The issue presented concerns the applicability of the sales and use tax exemption under § 77.54(6)(b), STATS., to packaging materials used to bundle newspapers that are then delivered to or picked up by MNI's carriers. Because the packaging materials are removed from the bundles and discarded by MNI's carriers before the newspapers are delivered to MNI's subscribers, the exemption only applies if a carrier qualifies as a "customer" under the statute. MNI contends that the carriers are customers, while DOR contends that it is the subscribers, not the carriers, who are MNI's customers.

757

Whether the carriers are MNI's "customers" under § 77.54(6)(b), STATS., presents an issue of statutory interpretation that we review de novo. *See Zignego Co. v. DOR*, 211 Wis. 2d 819, 823, 565 N.W.2d 590, 592 (Ct. App. 1997). However, when reviewing an administrative agency's interpretation of a statute, we may afford deference to that agency's conclusions. There are three distinct levels of deference that we afford an agency's interpretation: great weight, due weight or de novo. *See id.* at 823–24, 565 N.W.2d at 592. In *Zignego*, we explained each of these levels of deference.

We afford "great weight" to an agency's interpretation when the following conditions are met:

> (1) the agency was charged by the legislature with the duty of administering the statute; (2) that the interpretation of the agency is one of long-standing; (3) that the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) that the agency's interpretation will provide uniformity and consistency in the application of the statute.

*Id.* at 823, 565 N.W.2d at 592 (quoting *UFE Inc. v. LIRC*, 201 Wis. 2d 274, 284, 548 N.W.2d 57, 61 (1996)). When we afford great weight deference, we will sustain that agency's reasonable interpretation even if there is a more reasonable interpretation available. *See id.*

We afford "due weight" to an agency's interpretation when it "has some experience in an area, but has not developed the expertise that necessarily places it in a better position to make judgments regarding the interpretation of the statute than a court." *Id.* When we afford "due weight," we will not overturn an agency's

reasonable interpretation that comports with the purpose of the statute unless we determine that a more reasonable interpretation is available. *See id.* at 823–24, 565 N.W.2d at 592.

Finally, we review an agency's statutory interpretation de novo when the issue before the agency is clearly one of first impression, or when the agency's position on the issue has been so inconsistent so as to provide no real guidance. *See id.* at 824, 565 N.W.2d at 592. Regardless of the level of deference, we review the decision of the agency, not that of the circuit court. *See id.*

There is no dispute that the commission has a great deal of expertise and experience determining whether tax exemptions are appropriate when a sales and use tax is imposed. However, because there is only one other case in which this particular exemption has been interpreted,[3] the commission's interpretation is "very nearly" one of first impression. Due weight is appropriate in cases that are "very nearly" ones of first impression. *See William Wrigley, Jr., Co. v. DOR*, 176 Wis. 2d 795, 801, 500 N.W.2d 667, 670 (1993).

An agency's interpretation is reasonable if it "accords with the language of the statute, the statute's legislative history, and the legislative intent; if the interpretation is consistent with the constitution, the statute read as a whole, and the purpose of the statute; and if the interpretation is consistent with judicial

---

[3] The commission has interpreted the term "merchandise" as it is used in § 77.54(6)(b), STATS. *See Luetzow Indus. v. DOR*, 197 Wis. 2d 916, 541 N.W.2d 810 (1995).

analyses of the statute." *Lisney v. LIRC*, 171 Wis. 2d 499, 507, 493 N.W.2d 14, 16 (1992).

██

We further note that "[t]ax exemption statutes 'are to be strictly construed against the granting of the same, and the one who claims an exemption must point to an express provision granting such exemption by language which clearly specify the same, and thus bring himself clearly within the terms thereof.'" *La Crosse Queen, Inc. v. DOR*, 208 Wis. 2d 439, 446, 561 N.W.2d 686, 688 (1997) (quoting *Ramrod, Inc. v. DOR*, 64 Wis. 2d 499, 504, 219 N.W.2d 604, 607 (1974)). Any doubts or ambiguities as to whether the exemption applies are to be resolved in favor of taxation and against the person claiming the exemption. *See DOR v. Greiling*, 112 Wis. 2d 602, 605, 334 N.W.2d 118, 120 (1983); *see also Village of Menomonee Falls v. Falls Rental World*, 135 Wis. 2d 393, 396, 400 N.W.2d 478, 479 (Ct. App. 1986). While the interpretation of the exemption need not be unreasonable or the narrowest possible, it is to be strictly construed against granting the exemption. *See Greiling*, 112 Wis. 2d at 605, 334 N.W.2d at 120; *see also* § 77.54(6r), STATS.

## DISCUSSION

██

The term "customer" is not defined in the statute. If the legislature does not assign a technical meaning to a statutory word, § 990.01(1), STATS., provides that these words "shall be construed according to common and approved usage." We have frequently recognized dictionaries as an appropriate source of such usage. *See State v. McCoy*, 143 Wis. 2d 274, 287, 421 N.W.2d 107, 111 (1988); *cf. State v. Shea*, 221 Wis. 2d 418, 426–27, 585 N.W.2d 662, 665 (Ct. App. 1998) (use of dictiona-

ries does not mean statute is ambiguous). The dictionary defines "customer" as "one that purchases some commodity or service." WEBSTER'S THIRD NEW INT'L DICTIONARY 559 (1993). The term "purchase" is defined in § 77.51(12), STATS., to include:

> (a) Any transfer of title, possession, ownership, enjoyment, or use by: cash or credit transaction, exchange, barter, lease or rental, conditional or otherwise, in any manner or by any means whatever of tangible personal property for a consideration;
>
> (b) A transaction whereby the possession of property is transferred but the seller retains the title as security for the payment of the price.

MNI contends that its carriers qualify under this definition as "customers" because they purchase newspapers to resell to subscribers. MNI contends that the terms and conditions of its route carrier agreement, as well as its billing invoice statements, clearly support its assertion that the carriers are its customers who purchase the newspapers as independent contractors to resell to their customers, the subscribers. It argues that because the agreement clearly and unambiguously sets out a vendor-customer type arrangement, it is controlling on our analysis.[4] We disagree.

---

[4] MNI cites *Hanz Contractors, Inc. v. DOR*, St. Tax Rep. (CCH) ¶ 400–220 (Wis. Tax App. Comm'n 1996) (commission looked at contract between contractor and subcontractor, as well as billing reports, and concluded that a vendor-customer relationship existed) and *Aqua Finance, Inc. v. DOR*, St. Tax Rep. (CCH) ¶ 400–197 (Wis. Tax App. Comm'n 1996) (commission looked at contracts between taxpayer and customer and concluded it was a finance transaction, not a retail sales transaction).

In *DOR v. Sterling Custom Homes Corp.*, 91 Wis. 2d 675, 679, 283 N.W.2d. 573, 575 (1979), a sales tax exemption case, the court held that where an element of an exemption is at issue, we are to "make [our] determination [based on] the facts viewed as a whole[;] . . . it is the substance and realities of a taxpayer's activities that are determinative of the Department's power to tax." We therefore are to look at the facts as a whole, not just the parties' agreement, when determining whether MNI's carriers qualify as its customers.[5] The

[5] MNI argues that the commission should have made its decision as to whether the carriers were MNI's customers by looking solely at the route carrier agreement and the billing statements, and that it acted contrary to established precedent when it looked beyond these documents and applied a "substance over form" type analysis. MNI contends that this type of analysis was contrary to policy considerations and fundamental fairness, because the taxpayer had no notice that the commission would conduct such an inquiry. We disagree. There are examples in which the supreme court considered the facts as a whole when determining whether a tax exemption applied.

For instance, in *Family Hosp. Nursing Home, Inc. v. City of Milwaukee*, 78 Wis. 2d 312, 319, 254 N.W.2d 268, 272 (1977), the court was asked to determine if a corporation qualified as a tax-exempt organization. The court expressly declined to limit its inquiry to one document (the articles of incorporation) when determining if the business had a "benevolent" purpose. Instead, it chose to look at the facts as a whole to determine if the corporation qualified. Two years later in *DOR v. Sterling Custom Homes Corp.*, 91 Wis. 2d 675, 679, 283 N.W.2d 573, 575 (1979), the court held that it would make its determination as to whether a contractor's sales of customized homes were tax exempt by reviewing the facts as a whole.

We therefore reject MNI's assertion that the commission acted contrary to established precedent and policy considera-

commission conducted this type of comprehensive examination when it rendered its decision, and we find those findings and conclusions to be persuasive.

The commission noted that MNI's contracts and documents show a general, but inconsistent, intent to treat its carriers as its customers and the subscribers as the customers of the carriers. We agree. There are provisions in the route carrier agreement that suggest that the carriers are independent contractors who purchase the newspapers at wholesale and then sell them to subscribers at retail. The "service" provision of the route carrier agreement states that the carrier retains "complete control over all means, methods, and equipment that [he or she] might use to service [his or her] route." The "expenses and equipment" provision states that the carrier will service his or her route at his or her own expense and risk, that he or she is responsible for providing any equipment he or she may need, and that he or she has no right to reimbursement for expenses incurred in connection with his or her route.

■■

However, there is evidence which suggests that these provisions are not as liberating as they may

---

tions when it based its decision on the facts as whole, and not solely on the route carrier agreement. In addition, we reject MNI's contention that it had no advance notice that the commission would look to other evidence when making its decision. These two cases were in existence well before this action was commenced. Finally, we disagree with MNI's contention that this is an inappropriate case to apply this type of analysis simply because of the low monetary amount at issue. The case law clearly states that the court should make this type of comprehensive review, and we are satisfied that the commission acted appropriately in conducting its inquiry.

appear. For example, the agreement states that the carrier has complete control over servicing his or her route, yet there are certain requirements that MNI imposes which limit the carrier's control. The dominant test in determining whether a person is an independent contractor or an employee is who has the right to control the details of the work. *See Pamperin v. Trinity Mem'l Hosp.*, 144 Wis. 2d 188, 198–99, 423 N.W.2d 848, 852 (1988). We conclude that MNI retained a significant amount of control over its carriers.

The following are some of the examples that illustrate MNI's control over its carriers: (1) MNI, for the most part, set the wholesale and retail rates for which its newspapers could be sold; (2) MNI typically required the carriers to submit the names of their subscribers and told them to have new subscribers make their checks payable to MNI; (3) MNI pre-determined all routes and rarely permitted a carrier to serve a subscriber outside of that carrier's route; (4) carriers were not permitted to drop an office-pay subscriber, although it occasionally moved a subscriber from one route to another if a conflict arose; (5) MNI required carriers to distribute a product sample with the Sunday *Wisconsin State Journal*, and carriers who refused faced termination; (6) carriers were not permitted to distribute any other newspaper or magazine while they served their routes; (7) any questions and problems from subscribers were to be directed to MNI personnel; and (8) MNI required carriers to arrive at the warehouse to pick up the papers and deliver them within a certain time period.

The agreement also states that each carrier will service his or her route at his or her own expense and risk. However, the evidence indicates that MNI often

absorbed a certain amount of that expense and risk. For example, MNI paid an additional subsidy to all carriers requiring a motor vehicle and to carriers that served routes with a lower-than-average concentration of subscribers. Also, if a subscription lapsed, MNI would typically credit carriers for a certain number of papers delivered but not paid for by subscribers.

If, for whatever reason, a carrier failed to deliver a newspaper to a Madison area subscriber or delivered a defective newspaper, MNI would have one of its employees deliver a paper to the subscriber at no charge to the carrier or the subscriber. If a subscriber lived outside of the Madison area, and did not receive a paper, the carrier could purchase a newspaper at a local retail outlet, deliver the newspaper to the subscriber and be reimbursed for the cost, regardless of fault. The carriers also were paid the full retail rate for newspapers delivered to subscribers who were paying less than the retail rate.

In addition to the route carrier agreement, MNI argues that the billing reports it sends to its carriers clearly support its position. It points out that the report lists: the "total charges for paper you bought," and "money received from your customers who paid at the office." MNI contends that this language clearly illustrates a vendor-customer relationship.

While we agree that these billing reports tend to show an intent to have a vendor-customer relationship, there are other factors that undermine such a conclusion. First, in most vendor-customer relationships the vendor and customer come to an agreement on the price of the item being sold. In this relationship, MNI not only sets the wholesale rate charged to the carriers, but it often sets the rate charged to subscribers as well. Second, most wholesale vendors do not handle the bill-

ing and collection of their retail customers' subsequent sales. In this case, MNI handles both the billing and collection of over ninety percent of its subscribers. Finally, most wholesale vendors that handle the billing of their retail customers do not take the money collected, invest it in interest-bearing accounts, and then retain the interest generated from those accounts. MNI did all of these. We therefore are not convinced that the billing reports evinced an intent to have carriers be MNI's customers.

MNI argues that our focus should be limited to the terms of the route carrier agreement, particularly the provision: "I agree to purchase from the Publisher the number of newspapers which my route requires." It contends that this language clearly and unambiguously settles the issue of whether the carriers are its customers. MNI emphasizes the fact that the carriers agree to "purchase" the newspapers—the necessary element, according to the dictionary, to be a customer; therefore, the exemption should apply. We are not persuaded.

We must be satisfied based on the evidence that MNI is covered under the exemption, and we are to look at the facts as a whole when making this determination. Strictly construing § 77.54(6), STATS., we conclude that MNI has not met its burden. We conclude that the totality of the evidence demonstrates more of an agency type relationship, because MNI retains a substantial amount of control over the carriers and bears a significant amount of the expense and risk associated with the sale of the newspapers—characteristics uncommon in a vendor-customer relationship. We give due weight to the Tax Appeals Commission's conclusions and we are satisfied that the commission's

findings are both reasonable and consistent with the § 77.54(6r) mandate to interpret and apply the exemption strictly. Accordingly, we affirm.

*By the Court.*—Order affirmed.