ESTATE OF Sarah M. HEGARTY, deceased, by Jeremiah J. Hegarty, Special Administrator, and Jeremiah J. Hegarty and Mary D. Hegarty, Plaintiffs-Appellants,†

MILWAUKEE COUNTY, Involuntary-Plaintiff,

v.

Angela BEAUCHAINE, M.D., Ernest Stremski, M.D., Children's Hospital of Wisconsin, Inc., a Wisconsin hospital corporation, OHIC Insurance Company, a foreign insurance corporation, and The Medical College of Wisconsin, Inc., a Wisconsin corporation, Defendants,

MEDICAL COLLEGE OF WISCONSIN AFFILIATED HOSPITALS, INC., a Wisconsin corporation, Defendant-Respondent,†

PHYSICIANS INSURANCE COMPANY OF WISCONSIN, INC., a Wisconsin insurance corporation, Defendant,

Mary Jo ZIMMER, M.D., Fireman's Fund Insurance Company and Wisconsin Patients Compensation Fund, Defendants-Respondents.

Court of Appeals

*No. 00–2144. Oral argument September 4, 2001.—Decided October 30, 2001.*

---

† Petitions to review denied 2-19-02.

2001 WI App 300

(Also reported in 638 N.W.2d 355.)

145

147

148

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *William M. Cannon, Edward E. Robinson,* and *Sarah E. Frink* of *Cannon & Dunphy, S.C.,* of Brookfield, with oral argument by *William M. Cannon.*

On behalf of the defendant-respondent Medical College of Wisconsin Affiliated Hospitals, Inc., the cause was submitted on the brief of *Joseph M. Fasi, II* and *Peter F. Mullaney* of *Peterson, Johnson & Murray, S.C.,* of Milwaukee, with oral argument by *Peter F. Mullaney.*

On behalf of the defendants-respondents Mary Jo Zimmer, M.D., and Fireman's Fund Insurance Company, the cause was submitted on the brief of *Samuel J. Leib, Douglas S. Knott* and *Mark D. Malloy* of *Leib & Katt, S.C.,* of Milwaukee, with oral argument by *Samuel J. Leib.*

Before Fine, Schudson and Curley, JJ.

¶ 1. CURLEY, J. The estate of Sarah Hegarty and her parents, Jeremiah and Mary Hegarty, appeal from two separate orders of the circuit court granting summary judgment and dismissing all negligence claims against defendants, Mary Jo Zimmer, M.D., the Medical College of Wisconsin Affiliated Hospitals (Affiliated Hospitals), and their respective liability insur-

ance carriers. Five issues are raised on appeal: (1) whether the plaintiffs waived their statute of limitations argument; (2) whether WIS. STAT. § 893.55[1] is the controlling statute of limitations for wrongful death actions caused by medical malpractice; (3) whether the amended complaint adding Dr. Zimmer as a defendant relates back to the date of filing of the original complaint; (4) whether the plaintiffs discovered, or in the exercise of reasonable diligence should have discovered, what they believe was Dr. Zimmer's negligence in causing their daughter's death; and (5) whether Affiliated Hospitals is vicariously liable for the actions of its employee based on the doctrine of respondeat superior.

¶ 2. We conclude that because the wrongful death claims are based on medical malpractice, the trial court correctly applied the medical malpractice statute of limitations, found in WIS. STAT. § 893.55. We also conclude that because plaintiffs' addition of Dr. Zimmer to the medical malpractice action was not based on Dr. Zimmer's mistaken identity, the amended complaint does not relate back to the original complaint. Further, we determine that because a genuine issue exists as to a number of material facts, and reasonable conflicting inferences can be drawn from the undisputed facts, summary judgment was inappropriate and a trial is necessary to resolve: (1) whether Dr. Beauchaine was a servant of the Medical College of Wisconsin Affiliated Hospitals; and (2) whether Dr. Beauchaine was a borrowed employee. Therefore, this opinion is the decision of the court regarding: (1) the statute of limitations issue; (2) the relation back doctrine; and (3) Affiliated Hospitals' respondeat superior liability. However, with

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

respect to the Hegartys' discovery of Dr. Zimmer's role in Sarah's injury, Judge Fine's opinion is the decision of the court on the discovery issue.

## I. BACKGROUND.

¶ 3. In 1992, Sarah Hegarty (Sarah), then age twelve, became a patient of pediatrician Mary Jo Zimmer, M.D. (Dr. Zimmer). When Sarah began developing abdominal pain in 1995, she consulted with Dr. Zimmer. Dr. Zimmer referred Sarah to a pediatric gastroenterologist at Children's Hospital, who diagnosed her with irritable bowel syndrome.

¶ 4. On March 20, 1996, Sarah developed severe abdominal pain, nausea and vomiting. She was rushed to Children's Hospital's emergency room at 4:30 p.m. Sarah was initially treated by Ernest Stremski, M.D., the emergency room physician, and later by Angela Beauchaine, M.D., a first-year medical resident. Dr. Stremski admitted Sarah at 8:00 p.m.

¶ 5. Sarah's condition rapidly deteriorated. Dr. Beauchaine, who took over Sarah's care after she was admitted, was a first-year resident, not yet licensed to practice medicine. Dr. Beauchaine was enrolled in a graduate medical training program through the Medical College of Wisconsin (Medical College) and the Medical College of Wisconsin Affiliated Hospitals (Affiliated Hospitals). From the time of Sarah's admission until Dr. Zimmer arrived at 7:30 a.m. on the morning of March 21, 1996, no licensed physician saw Sarah to evaluate her condition.

¶ 6. The medical records reflect that by 6:00 a.m. on March 21, 1996, Sarah's abdomen was distended, rigid and tender. Sarah's condition became critical at 11:45 a.m.; she was resuscitated and taken to surgery at

approximately 1:45 p.m. However, by that time, Sarah was diagnosed with small bowel volvulus with complete bowel infarction, meaning her small bowel had been twisted and cut off from the blood supply.

¶ 7. On March 16, 1998, after more than fifty surgical procedures related to her intestinal difficulties, Sarah died. The cost of Sarah's medical care over this two-year period reached nearly $3,000,000. On December 18, 1998, the plaintiffs filed suit setting forth survival claims on behalf of Sarah's estate and wrongful death claims on behalf of Sarah's parents. The complaint was brought against Dr. Beauchaine, Dr. Stremski, Children's Hospital, the Medical College, Affiliated Hospitals, their respective liability insurers, and the Wisconsin Patients Compensation Fund.

¶ 8. As part of a discovery request, the plaintiffs received medical records from Children's Hospital in April of 1997, but it was not until September of 1999 that the plaintiffs took the depositions of Drs. Stremski, Beauchaine and Zimmer. In their depositions, Drs. Stremski and Beauchaine stated that Dr. Zimmer had been involved in Sarah's care before arriving at the hospital on the morning of March 21, 1996. They revealed that each had spoken with Dr. Zimmer over the telephone on March 20, 1996, and that Dr. Zimmer had directed Sarah's treatment throughout the evening and into the early morning. On December 20, 1999, based on information disclosed at these depositions, the plaintiffs filed an amended complaint adding Dr. Zimmer to the lawsuit.

¶ 9. The trial court dismissed the claims against Dr. Zimmer, determining that the action was barred by the medical malpractice statute of limitations, WIS. STAT. § 893.55. The court also dismissed the claims against Affiliated Hospitals, which were based on the

doctrine of respondeat superior. The trial court ruled that Affiliated Hospitals could not be held vicariously liable for Dr. Beauchaine's negligence when it had no control over the details of her work.

## II. ANALYSIS.

### A. *Waiver and the Statute of Limitations Argument*

¶ 10. The Hegartys assert, for the first time on appeal, that the statute of limitations governing wrongful death actions applies to Dr. Zimmer's medical malpractice and, thus, the action was timely. Generally, this court will not review an issue raised for the first time on appeal, but this rule of judicial administration does not affect the appellate court's power to address the issue. *Wirth v. Ehly*, 93 Wis. 2d 433, 443–44, 287 N.W.2d 140 (1980), *superseded on other grounds by* WIS. STAT. § 895.52. Assuming that this issue was waived, we choose to address it for three reasons.

¶ 11. First, where a waived issue is of statewide importance or interest, we may choose to address it in the interests of judicial economy. *State v. Schmaling*, 198 Wis. 2d 756, 763, 543 N.W.2d 555 (Ct. App. 1995); *Weichers v. Weichers*, 197 Wis. 159, 162, 221 N.W. 733 (1928). We address the present issue to assure that the families of those who claim to have been injured or to have died as a result of medical malpractice have adequate notice regarding their potential claims against health care providers. Further, the question is significant because similar fact situations are likely to arise.

¶ 12. Second, appellate courts may review issues raised for the first time on appeal when a question of law is presented that is not dependent on the facts as presented below. *In re Graffin v. Hulett*, 6 Wis. 2d 20, 27, 94 N.W.2d 127 (1959). The issue here concerns the application of a statute of limitations, which is a question of law, *see Webb v. Ocularra Holding, Inc.*, 232 Wis. 2d 495, 502, 606 N.W.2d 552 (Ct. App. 1999), *overruled on other grounds by Paul v. Skemp*, 2001 WI 42, 242 Wis. 2d 507, 625 N.W.2d 507, and independent from the facts in the record.

¶ 13. Third, where the parties have fully briefed the issue, as they have here, and where there are no factual disputes, the appellate courts may overlook waiver. *Wirth*, 93 Wis. 2d at 444. Thus, for the reasons stated, we elect to decide the statute of limitations issue.

*B. Statute of Limitations*

¶ 14. In reviewing a trial court's grant of summary judgment, we first consider which statute of limitations applies. *See Ritt v. Dental Care Assocs.*, 199 Wis. 2d 48, 60, 543 N.W.2d 852 (Ct. App. 1995). Determining which statute of limitations applies to an action is a question of law which we review *de novo*. *Webb*, 232 Wis. 2d at 502.

¶ 15. The trial court ruled that all claims brought by the Hegartys and Sarah's estate were subject to the medical malpractice statute of limitations, WIS. STAT.

§ 893.55(1).[2] The Hegartys contend that the general statute of limitations concerning injury to the person, found in Wis. Stat. § 893.54,[3] should be applied to their wrongful death claim. We disagree and conclude that wrongful death claims caused by medical malpractice are subject to the specific statute of limitations concerning medical malpractice, found in Wis. Stat. § 893.55(1).

¶ 16. The meaning of a statute is a question of law which we review *de novo*. *Schmidt v. Wisconsin Employe Trust Funds Bd.*, 153 Wis. 2d 35, 41, 449 N.W.2d 268 (1990). Whether the Hegartys' wrongful death action is time barred by the statute of limitations that governs medical malpractice actions is an issue of first

---

[2] Wisconsin Stat. § 893.55(1) provides:

**Medical malpractice; limitation of actions; limitation of damages; itemization of damages. (1)** Except as provided by subs. (2) and (3), an action to recover damages for injury arising from any treatment or operation performed by, or from any omission by, a person who is a health care provider, regardless of the theory on which the action is based, shall be commenced within the later of:

(a) Three years from the date of the injury, or

(b) One year from the date the injury was discovered or, in the exercise of reasonable diligence should have been discovered, except that an action may not be commenced under this paragraph more than 5 years from the date of the act or omission.

[3] Wisconsin Stat. § 893.54 provides:

**Injury to the person.** The following actions shall be commenced within 3 years or be barred:

**(1)** An action to recover damages for injuries to the person.

**(2)** An action brought to recover damages for death caused by the wrongful act, neglect or default of another.

impression involving statutory construction. *See Paul v. Skemp*, 2001 WI 42, ¶ 10, 242 Wis. 2d 507, 625 N.W.2d 860. "A court will not ordinarily engage in statutory construction unless a statute is ambiguous." *Czapinski v. St. Francis Hosp.*, 2000 WI 80, ¶ 17, 236 Wis. 2d 316, 613 N.W.2d 120 (citation omitted).

> [T]he purpose of statutory construction is to ascertain and give effect to the intent of the legislature. In determining legislative intent, however, first resort must be to the language of the statute itself. . . . A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses.

*State v. Martin*, 162 Wis. 2d 883, 893–94, 470 N.W.2d 900 (1991) (citations omitted).

¶ 17. Here, reasonable minds have understood the interplay of these statutes in different ways; therefore, we are required to interpret the statute to determine the intent of the legislature. While either statute considered independently could be applicable, only one will be applied. *See Clark v. Erdmann*, 161 Wis. 2d 428, 436, 468 N.W.2d 18 (1991). Since WIS. STAT. § 893.55 is the more specific of the two statutes, we begin our analysis there to determine if its terms are met. *Id.* at 436–37.

¶ 18. We first turn to the language of the statute itself. WISCONSIN STAT. § 893.55 encompasses "damages for injury arising from any treatment or operation performed by . . . a health care provider, *regardless of the theory on which the action is based.*" (Emphasis added.) As the supreme court noted in *Clark*:

> Section 893.55 clearly is the more specific of the two statutes. Unlike sec. 893.54, it concerns itself not only

with injury to the person, but also with a particular way in which the injury arises, *i.e.,* resulting from an act or omission of a "health care provider."

*Id.* at 436–37. Thus, it is apparent that the legislature intended that any claim alleging negligence against a health care provider would be controlled by § 893.55, even though the medical malpractice claim is based on a wrongful death theory of negligence.

¶ 19. Despite the existence of case law supporting our conclusion, the Hegartys argue that WIS. STAT. § 893.55(1) deals only with medical malpractice *injury* claims, not death. However, this distinction is of no consequence in a medical malpractice setting. In analyzing § 893.55, the supreme court stated: "[T]here is no logical distinction between injury and death claims arising out of medical malpractice. Once medical malpractice produces a loss, a remedy exists regardless whether the consequence is injury or death." *Rineck v. Johnson,* 155 Wis. 2d 659, 671, 456 N.W.2d 336 (1990), *overruled in part by Chang v. State Farm Mut. Auto Ins. Co.,* 182 Wis. 2d 549, 514 N.W.2d 399 (1994).

¶ 20. In *Rineck,* the supreme court examined the relationship between ch. 655, STATS., and § 893.55. *Id.* at 665. The court stated:

Chapter 655, Stats., enacted by ch. 37, Laws of 1975, established an exclusive procedure for the prosecution of malpractice claims against a health care provider. . . . Chapter 655 sets tort claims produced by medical malpractice apart from other tort claims, and parties are conclusively presumed to be bound by the provisions of the chapter regardless of injury or death.

*Id.* (citation omitted). "[S]oon after the enactment of Chapter 655, the legislature passed WIS. STAT. § 893.55, in part, to limit the damages a claimant could recover

157

under medical malpractice claims." *Czapinski*, 2000 WI 80 at ¶ 14. Section 893.55 is the exclusive statute of limitations for Chapter 655 claims and limits "[e]conomic damages recovered under ch. 655 for bodily injury *or death.*" WIS. STAT. § 893.55(4)(e) (emphasis added).

¶ 21. While *Rineck* and *Czapinski* dealt with the issue of damages in medical malpractice claims, they clearly stand for the proposition that "by singling out medical malpractice claims in such a manner, the legislature intended to set medical malpractice cases involving death apart from other death cases to which the general wrongful death statute applies." *Rineck*, 155 Wis. 2d at 671. Thus, we must conclude that § 893.55 unequivocally applies to both injury and death claims resulting from medical malpractice. Therefore, wrongful death claims that are the result of medical malpractice are subject to § 893.55.[4]

---

[4] The Hegartys argue that this would produce an absurd result because the wrongful death action could conceivably expire before it accrued when an individual was injured and discovered the injury but lived for more than one year and subsequently died. Therefore, they conclude, under § 893.54 the action would not accrue until death but would expire before the death of the claimant under § 893.55(1)(b).

This argument, however, is based on the faulty premise that one would be applying the wrongful death statute of limitations, § 893.54, and, consequently, the action would not accrue until death. Applying the correct statute of limitations, § 893.55, the action " 'accrues' when the claimant 'discovers' the injury." *Aicher v. Wisconsin Patients Comp. Fund*, 2000 WI 98, ¶ 82, 237 Wis. 2d 99, 613 N.W.2d 849. Although it is possible to bar a medical malpractice action before one discovers an injury, and

## C. Relation Back

██

¶ 22. The amended complaint against Dr. Zimmer was filed in December of 1999, more than three years from the date of Sarah's injury. The trial court ruled that the amended complaint was also filed more than one year from the date the Hegartys should have discovered Dr. Zimmer's role in Sarah's hospitalization and treatment. Accordingly, the trial court granted summary judgment in favor of Dr. Zimmer, concluding that the amended complaint was barred by the statute of limitations, § 893.55(1).

██

¶ 23. Our review of a trial court's grant of summary judgment is *de novo. Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315–16, 401 N.W.2d 816 (1987). Summary judgment must be granted if the evidence demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. RULE 802.08(2).

¶ 24. The Hegartys contend that the amended complaint against Dr. Zimmer relates back to the date of filing of the original complaint—December 18, 1998. Thus, they conclude that the amended complaint was filed within three years of the date of injury. However, the relation back doctrine cannot be applied because there was no mistake as to Dr. Zimmer's identity. We

this may yield a harsh result, the supreme court has held that § 893.55(1)(b) "do[es] not violate the right-to-remedy clause because a prospective claimant does not have a legislative right to pursue a medical malpractice action if the injury is discovered after the statutory time limitation period elapses." *Id.* at ¶ 85.

conclude that because Dr. Zimmer's identity was never in doubt, the amended complaint does not relate back to the original filing date.

¶ 25. WISCONSIN STAT. § 802.09(3) provides:

> If the claim asserted in the amended pleading arose out of the transaction, occurrence, or event set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the filing of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and ... such party ... has received such notice of the institution of the action that he or she will not be prejudiced in maintaining a defense on the merits, and knew or should have known that, *but for a mistake concerning the identity of the proper party,* the action would have been brought against such party.

(Emphasis added.) "The phrase 'changing the party' can be read in four different ways: (1) substitution of a new defendant for the present defendant, (2) addition of a defendant, (3) changing the stated capacity of the defendant and (4) changing a misdescription or misnaming (misnomer) of the defendant." *State v. One 1973 Cadillac*, 95 Wis. 2d 641, 649, 291 N.W.2d 626 (Ct. App. 1980) (citations omitted).

¶ 26. While changing a party under § 802.09(3) includes adding a party, *see One 1973 Cadillac*, 95 Wis. 2d at 649–50, in order to do so there must have existed a mistake concerning the identity of the proper party now being added when the original pleading was filed, *see* WIS. STAT. § 802.09(3). Although the Hegartys claim they did not know the extent of Dr. Zimmer's involvement, they never assert that they were confused about Dr. Zimmer's identity.

160

¶ 27. "Identity" is defined as "[t]he collective aspect of the set of characteristics by which a thing is definitively recognizable or known." AMERICAN HERITAGE DICTIONARY 639 (2d ed.). We interpret this to include an individual's name and physical characteristics which, taken as a whole, distinguish that person from another person, signifying their individuality. Here, the Hegartys were not confused as to Dr. Zimmer's name or defining characteristics. They never confused Dr. Zimmer with another doctor. The Hegartys have known Dr. Zimmer since at least 1992, when she began treating Sarah. The Hegartys experienced difficulty in identifying the extent of Dr. Zimmer's alleged negligence, not her identity. Thus, because there was no mistake concerning Dr. Zimmer's identity, the amended complaint does not relate back to the original complaint. *See Groom v. Prof'ls Ins. Co.*, 179 Wis. 2d 241, 252–53, 507 N.W.2d 121 (Ct. App. 1993) (holding that because plaintiff's addition of parties to medical malpractice action was not based on mistaken identities, amended complaint did not relate back to original complaint).

## D. The Discovery Rule

¶ 28. As previously stated, our review of a trial court's grant of summary judgment is *de novo*. *Green Spring Farms*, 136 Wis. 2d at 315–16. Summary judgment is used to determine whether there are any disputed facts that require a trial, and, if not, whether a party is entitled to judgment as a matter of law. *Id.* at 315; WIS. STAT. § 802.08(2).

¶ 29. Summary judgment methodology is the same for trial and appellate courts. *Preloznik v. City of Madison*, 113 Wis. 2d 112, 115–16, 334 N.W.2d 580 (Ct. App. 1983). In the present case, we must first determine

whether the complaint states a claim. *Green Spring Farms*, 136 Wis. 2d at 315. If the Hegartys have stated a claim and the pleadings show the existence of factual issues, then we must examine whether the moving party, Dr. Zimmer, has presented a defense that would defeat the claim. *See Preloznik*, 113 Wis. 2d at 116. If Dr. Zimmer has made a prima facie case for summary judgment, the court examines the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to determine whether a genuine issue exists as to any material fact, or whether reasonable conflicting inferences may be drawn from undisputed facts, both of which require a trial. *See Green Spring Farms*, 136 Wis. 2d at 315; *Ford Farms Ltd. v. Wisconsin Elec. Power Co.*, 145 Wis. 2d 650, 654, 430 N.W.2d 94 (Ct. App. 1988).

¶ 30. Here, the Hegartys rely on the discovery rule in contending that the trial court improperly granted summary judgment. They argue that while the amended complaint was filed more than three years after the date of injury, their suit against Dr. Zimmer was properly brought within one year of discovering Dr. Zimmer's negligence in causing Sarah's injuries. The trial court disagreed and granted summary judgment in favor of Dr. Zimmer based on the expiration of the statute of limitations under WIS. STAT. § 893.55(1). The trial court determined that, based on the discovery rule as applied in *Groom v. Prof'ls Ins. Co.*, 179 Wis. 2d 241, 507 N.W.2d 121 (Ct. App. 1993), a review of the hospital records, obtained by the Hegartys from Children's Hospital in April of 1997, should have alerted them to Dr. Zimmer's role in the actions causing Sarah's injury at least one year before they filed the amended complaint adding Dr. Zimmer to the lawsuit.

¶ 31. The discovery rule was established in *Hansen v. A.H. Robins Co.*, 113 Wis. 2d 550, 335 N.W.2d 578 (1983). Under the discovery rule, a cause of action accrues on the date the injury is discovered or with reasonable diligence should be discovered, whichever occurs first. *Id.* at 560.

¶ 32. This rule was further developed in *Borello v. U.S. Oil Co.*, 130 Wis. 2d 397, 388 N.W.2d 140 (1986). The plaintiff in *Borello* had a furnace installed in her basement and within a few weeks was suffering from headaches, dizziness and respiratory problems. *Id.* at 400. She saw a number of doctors and, despite her insistence to the contrary, they told her that her symptoms were probably not related to the furnace. *Id.* at 409. Two years after her initial symptoms began, a doctor diagnosed her with "metal fume fever" which was caused by the defective furnace. *Id.* She filed suit and a statute of limitations defense was advanced. *Id.* at 399. The supreme court concluded that the plaintiff had not discovered her injury until the doctor's diagnosis of "metal fume fever." *Id.* at 401. In concluding that discovery includes discovery of the probable cause of injury, the court stated that "a cause of action will not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only the fact of injury but also that the injury was probably caused by the defendant's conduct or product." *Id.* at 411.

¶ 33. In the present case, the Hegartys claim they did not obtain knowledge of Dr. Zimmer's negligent conduct regarding Sarah's care until September of 1999 when the depositions of Drs. Beauchaine and Stremski were taken. However, "the question at this stage of the proceedings is not when [the Hegartys] actually learned

163

[they] had a claim against [Dr. Zimmer], but when [they] should have known." *Groom,* 179 Wis. 2d at 250 n.3.

¶ 34. Dr. Zimmer asserts that the Hegartys should have known the extent of her involvement after examining the medical records. Therefore, we must examine the medical records to determine whether the plaintiff exercised reasonable diligence in discovering not only the injury but also "the defendant[']s part in that cause." *Kolpin v. Pioneer Power & Light Co.,* 162 Wis. 2d 1, 24, 469 N.W.2d 595 (1991). Additionally, in our summary judgment analysis, we look to see whether any facts are disputed regarding discovery and, if undisputed, whether only one inference can be reasonably drawn from those facts. *See Ford Farms,* 145 Wis. 2d at 654.

¶ 35. The relevant facts and dates in this analysis include:

1. On March 20, 1996, at 4:30 p.m., Sarah was taken to Children's Hospital;

2. On March 20, 1996, at 8:00 p.m., Dr. Stremski admitted Sarah to Children's Hospital;

3. After Sarah's admission, Dr. Beauchaine was the physician who physically attended to Sarah during the evening and early morning;

4. On March 21, 1996, at 8:15 a.m., Dr. Zimmer first examined Sarah and transferred her to intensive care;

5. In April of 1997, the Hegartys received the medical records from Children's Hospital pursuant to a discovery request;

6. On March 16, 1998, Sarah died;

7. On December 18, 1998, the Hegartys filed suit against Dr. Stremski, Dr. Beauchaine, Children's Hospital, the Medical College, Affiliated Hospitals, their respective liability insurers, and the Wisconsin Compensation Fund;

8. In September of 1999, the Hegartys deposed Dr. Stremski and Dr. Beauchaine, and, as a result of their testimony, deposed Dr. Zimmer;

9. On December 20, 1999, the Hegartys moved to amend their complaint adding Dr. Zimmer as a defendant.

¶ 36. The Hegartys maintain that by 6:00 a.m. on March 21, Sarah's condition had deteriorated so drastically that no medical attention could have saved her life. They argue that Sarah's abdomen would not have become distended and her small intestines would not have died, requiring further surgeries, but for the negligence of those attending to her the night of March 20 and into the early morning. They contend that based on the medical records provided by Children's Hospital, they reasonably concluded that Dr. Stremski and Dr. Beauchaine were primarily responsible for the negligence; not Dr. Zimmer, whose name did not appear in the medical records as attending to Sarah until after 8:00 a.m. on the morning of March 21.

¶ 37. No one disputes that Dr. Zimmer's name was listed in several places in Sarah's Children's Hospital medical records received by the Hegartys: (1) The "History and Physical Examination" form, listing Dr. Zimmer as Sarah's primary physician, and her phone number at the top of the page (this form was eventually signed by Dr. Zimmer at 8:15 a.m. on March 21, 1996);

(2) The "Emergency Service Admission Orders," a pre-printed form, stating that Sarah was a private patient of Dr. Zimmer; (3) The "Patient Admission Information" form, a computer-generated data sheet, which, among other information, contains the writing, "ATT1 Zimmer, Mary Jo"; and (4) The "Progress Notes," containing medical entries by Dr. Zimmer, all entered after the early morning on March 21, 1996. These entries referencing Dr. Zimmer are simply administrative or pro forma entries, and the fact that Dr. Zimmer's name is listed as Sarah's primary pediatrician says nothing about whether Dr. Zimmer was involved in Sarah's care during the "critical time period" of the late afternoon on March 20 until early morning on March 21. Further, Dr. Zimmer's entries made on the morning of March 21, gave no indication that Dr. Zimmer was involved in Sarah's care during the "critical time."

¶ 38. Ultimately, these records provide very limited information regarding Dr. Zimmer's role in Sarah's treatment during the critical hours of her care. Certainly the Hegartys already knew that Dr. Zimmer was their daughter's primary physician and that she had arrived at the hospital at approximately 8:00 a.m. on March 21, but these records do not indicate in any way that Dr. Zimmer was called several times on March 20, nor do they clarify that Dr. Zimmer discussed Sarah's care with Drs. Beauchaine and Stremski and recommended the critical course of future treatment, over the phone, based on a first-year resident's observations, which would carry Sarah through the night.

¶ 39. The Hegartys submit that it was not until they deposed Drs. Stremski and Beauchaine in the Fall of 1999 that they discovered Dr. Zimmer's crucial role in the admission and care of their daughter during the evening of March 20, 1996, and the early morning of

166

March 21, 1996. At the depositions, they discovered that Dr. Stremski called Dr. Zimmer before admitting Sarah at 8:00 p.m. on March 20. They also learned that during this phone conversation, Dr. Zimmer discussed Sarah's condition, accepted the admission and concurred with Dr. Stremski's course of treatment. They also were surprised to learn that Dr. Beauchaine spoke with Dr. Zimmer by telephone at approximately 8:00 p.m. on March 20 and that all of the orders that Dr. Beauchaine recommended throughout the night were based on Dr. Zimmer's recommended course of treatment. Moreover, the Hegartys assert they had no knowledge that at approximately 6:00 a.m. on March 21, Dr. Beauchaine again spoke with Dr. Zimmer and informed her of Sarah's deteriorating condition and only then did Dr. Zimmer tell her to request a gastrointestinal consultation.

¶ 40. This information simply is not attainable from the records alone. Based on the medical records provided to the Hegartys in April of 1997, in the exercise of reasonable diligence, they could not have suspected Dr. Zimmer's negligence. *See Groom*, 179 Wis. 2d at 247–48. However, the trial court stated:

> So that from the records that I have referenced here this morning, I conclude that Dr. Zimmer's supervision of Dr. Beauchaine . . . could be inferred to be within the reach of the plaintiff from the documents. . . .
>
> . . . . So that the conclusion is that I don't believe under the circumstances that the plaintiff is entitled to the date of the discovery rule. The information in the medical records is sufficient.

This author disagrees. The medical records do not yield an accurate account of the pertinent events that led to Sarah's injury. Nowhere in the medical records does it

clearly reflect that Dr. Zimmer was involved in Sarah's care, nor do they refer to Dr. Zimmer's directions to Dr. Beauchaine in regards to Sarah's course of treatment. The circumstances present here are distinguishable from those in *Groom*, relied upon by the trial court.

¶ 41. In *Groom*, a woman brought a medical malpractice action against a doctor for the death of her husband. *Id.* at 245. She later amended her complaint to add another doctor and his medical group, but the trial court dismissed her amended complaint as barred by the medical malpractice statute of limitations, WIS. STAT. § 893.55, because the amended complaint was filed more than one year after she should have discovered her claims against the additional doctor. *Id.* The trial court ruled that the date of discovery was the day hospital records were sent to her containing "the identities of [her husband's] health care providers *and the nature of care provided to him.*" *Id.* at 248 (emphasis added).

¶ 42. In *Groom*, this court examined the medical records and concluded that "the only reasonable inference from them is that [the wife] had information to form the basis for an objective belief that [the doctor]'s treatment was a cause of her husband's death." *Id.* at 249–50. The hospital records in *Groom* not only disclosed the identity of the physicians connected with her husband's care, but also contained information that the doctor in question took a cardiac history of her husband, knew her husband's course of treatment, and had knowledge that another doctor had prescribed the drug that caused her husband's death. *Id.* at 250. Finally, the records also revealed that this doctor had developed a clinical impression and a course of treatment. *Id.*

¶ 43. Unlike *Groom*, where the court determined that "the material facts are undisputed," and that there

was "only [one] reasonable inference from these undisputed facts," *id.* at 249–50, the present case has a number of unresolved factual issues and any number of conflicting inferences which can be drawn from the medical records. With respect to Dr. Zimmer's allegations that the Hegartys should have known that she was called by examining the medical records, the trial court stated:

> It is certainly true that the records don't contain everything that happened here. There were the telephone calls that took place. Not every telephone call is noted.
>
> . . . .
>
> The Milwaukee Children's Hospital records are not complete in every respect. As I said before, they don't reflect every phone call between Dr. Zimmer and Dr. Beauchaine. There were evidently phone calls made.

¶ 44. First, no telephone calls are "noted" in the medical records. The medical records failed to note *any* phone calls between "Dr. Zimmer and Dr. Beauchaine." Second, during oral argument, the parties' own attorneys could not agree on the number of phone calls referenced in the medical records. However, in Dr. Zimmer's brief in support of dismissal, she argues that "[t]he medical records are clear as to who treated Sarah, when they treated her, and what the treatment consisted of. . . . The Plaintiffs knew that Dr. Zimmer was involved in Sarah's treatment." Further, in argument to this court, Dr. Zimmer insisted that, "the emergency room records clearly reflect telephone calls on the evening of March 20, 1996 to the 'admitting physician,'

169

Dr. Zimmer, which, at the very least would warrant counsel's immediate attention." Dr. Zimmer's contentions are incorrect.

¶ 45. A careful review of the medical records reveals no clear evidence of phone calls to Dr. Zimmer. Dr. Zimmer points to two documents in support of her conclusion: (1) the "Emergency Room [N]ursing [N]ote," and (2) the "History and Physical Examination" form. The "Emergency Room [N]ursing [N]ote," dated March 20, 1996, written before Sarah was admitted to the hospital, lists a number of notes and observations, and their times:

> . . . . [T]oday, [no] diarrhea. Started [approximately] 1 hr. ago. Lips dry. To room 3 – [Doctor] to examine.
>
> 1735 – LR bolus started, [complained of] being cold, blankets given. . . .
>
> 1750 – [Patient] states not feeling any better, feeling worse. . . .
>
> 1850 – To have x-ray . . . x-ray done[.] *Admitting called.* (emphasis added)
>
> 1945 – Fleets enema given. . . . Awaiting results. . . .
>
> 2000 – Report to [nurse]. . . .
>
> ADM. CALLED @ 1940

Nothing in this note conclusively states that Dr. Zimmer was called. The Nursing Note only states that "Admitting" was called. Nothing indicates that "Admitting" is a doctor, let alone Dr. Zimmer. In fact, "Admitting" is more likely the admitting desk of the hospital. The second document, the "History and Physical Examination" form, is a four-page document that has Dr.

Zimmer's name and phone number written on the top of the front page, but there is no reference in that document that Dr. Zimmer was ever actually called.

¶ 46. These documents simply do not substantiate that Dr. Zimmer was called on March 20, 1996. Thus, contrary to Dr. Zimmer's argument, the records do not "clearly reflect telephone calls" on the evening of March 20, 1996, to the " 'admitting physician,' Dr. Zimmer." Absent the information supplied by Drs. Beauchaine and Stremski in their depositions, no one could reasonably surmise from these minor references to "doctor" or "admitting" in the medical records that Drs. Beauchaine and Stremski actually spoke to Dr. Zimmer about Sarah's care on March 20, 1996, or the morning of March 21. From these pro forma references, one could conclude only that Dr. Zimmer was Sarah's pediatrician, but no one could reasonably suspect that Dr. Zimmer discussed Sarah's condition with the treating physicians, concurred with their course of treatment, and recommended all of Sarah's treatment orders throughout the night. While Dr. Zimmer's name is certainly listed on the medical records, the records do not reveal Dr. Zimmer's role in supervising Sarah's care.

¶ 47. While true that "[p]laintiffs may not close their eyes to means of information *reasonably accessible* to them and must in good faith apply their attention to those particulars which may be inferred *to be within their reach*," *Groom*, 179 Wis. 2d at 251 (emphasis added), without more in the medical records, it was impossible for the Hegartys to know of Dr. Zimmer's crucial role without the information later supplied by Drs. Beauchaine's and Stremski's deposition testimony regarding the phone calls. Unlike *Groom*, these records do not readily demonstrate Dr. Zimmer's involvement

171

during the critical hours of Sarah's care.[5] Further, this factual dispute goes to the heart of whether the evidence contained in the medical records provided the Hegartys with sufficient information such that they should have known Dr. Zimmer's role in the cause of Sarah's injury. Accordingly, the number, clarity and presence of any reference in the hospital records to phone calls made by Dr. Stremski and Dr. Beauchaine to Dr. Zimmer on the dates in question is a material fact that remains in dispute.

¶ 48. Additionally, Dr. Zimmer challenged, at trial and on appeal, whether the Hegartys had personal knowledge of the level of Dr. Zimmer's involvement. Both parents filed affidavits with the trial court stating that they had no knowledge of Dr. Zimmer's involvement in their daughter's care during the evening of March 20 and the early morning of March 21 until after the depositions of the other doctors. However, in its

[5] *Borello v. U.S. Oil Co.*, 130 Wis. 2d 397, 388 N.W.2d 140 (1986), also makes clear that subjective beliefs, suspicions, or hunches will not be enough to establish a date of discovery. *Id.* at 411–16. This rationale becomes relevant in light of the present facts and the supreme court's recent decision in *Jandrt v. Jerome Foods, Inc.*, 227 Wis. 2d 531, 597 N.W.2d 744 (1999), where the court concluded that a law firm unreasonably followed an expert/doctor's suggestion to continue a lawsuit in order to "take discovery" concerning a weak causal link. *Id.* at 565–66. In sanctioning the lawyers for continuing a frivolous lawsuit, the court explained that lawyers will not be allowed to claim "safe harbor" where they choose to file an action first and then sort out the underlying element of causation through discovery where an investigation could be completed without discovery. *Id.* at 567–69. The court concluded that the "file first and ask questions later" approach to litigation will not carry the day. *Id.* at 569.

decision granting summary judgment, the trial court, referencing the medical records, stated:

> At the bottom of this form appears the signature of Sarah's mother. The signature and time is not indicated nor is the date.
>
> . . . .
>
> I certainly wouldn't expect that Mrs. Hegarty, in signing that last document that I mentioned, the consent form, would have immediately taken note of the paragraph that I read if for no other reason than that she was under considerable stress . . . but it would be some disclosure to anybody looking over those records that there is a hierarchy here and that residents are under the supervision of attending physicians.

¶ 49. This dispute surrounding what the Hegartys knew and when they knew it becomes more apparent in light of Dr. Zimmer's attorney's oral argument immediately preceding the trial court's decision in which counsel stated: "They are claiming that even when [Dr. Zimmer] got there, she didn't do the right thing. They knew that. They have known that since the date this took place. Mrs. Hegarty was standing right there. They knew that when they went to an attorney. They had a suspicion." In her brief, Dr. Zimmer argued that "Sarah's mother was present at the time of injury" and "[p]laintiffs knew of all physicians rendering treatment." In her pleadings, Dr. Zimmer argued that the medical records "would only have confirmed what Sarah's mother already knew because she was present with Dr. Zimmer at Children's." Finally, Dr. Zimmer concluded that "[t]his time frame includes the 22 hour 'delay' which constitutes the basis of the Plaintiff's claim," *i.e.*, the critical time.

173

¶ 50. It is clear that the parties dispute whether Sarah's parents had actual knowledge of Dr. Zimmer's negligence. Moreover, the trial court implied that, at some point, the Hegartys attained personal knowledge of Dr. Zimmer's supervision, despite their affidavits to the contrary. As referenced above, the trial court relied on this fact in its summary judgment analysis.

¶ 51. "When the material facts are undisputed, and only one inference can reasonably be drawn from them, whether a plaintiff exercised reasonable diligence in discovering [the] injury is a question of law." *Id.* at 249. Moreover, if "only one reasonable inference may be drawn from the undisputed facts, then the drawing of that inference is a question of law, and an appellate court may draw it." *Id.* However, we will reverse a summary judgment if a review of the record reveals that disputed material facts exist or undisputed material facts exist from which reasonable alternative inferences may be drawn. *Grams v. Boss*, 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980).

¶ 52. Here, a number of material facts remain in dispute. First, based on the arguments at trial and on appeal, it is clear that the parties disagree as to whether the Hegartys had personal knowledge of Dr. Zimmer's supervision before the fall of 1999. This dispute is material because without knowing of Dr. Zimmer's supervision of Sarah's care during the evening, the Hegartys were unaware of their daughter's "injury, its nature, its cause, *and the identity of the allegedly responsible defendant.*" *Spitler v. Dean*, 148 Wis. 2d 630, 635, 436 N.W.2d 308 (1989).

¶ 53. Second, as noted, there is a factual dispute as to the number and nature of the phone calls between the hospital and Dr. Zimmer as reflected in the medical records. While the trial court correctly concluded that

174

this does not affect whether the Hegartys *actually* knew, it does affect whether "there [wa]s information available to the claimant of . . . the cause of her injury [ ] and the defendant's part in that cause." *Ford Farms Ltd. v. Wisconsin Elec. Power Co.*, 145 Wis. 2d at 657.

¶ 54. Finally, "whether a factual inference may be drawn, whether it is reasonable and whether it is the only reasonable inference are all questions of law for this court to decide." *Id.* at 249. The trial court concluded that Dr. Zimmer's supervision of Dr. Beauchaine could be inferred from the hospital records alone. After an independent review of the medical records, this is not the only reasonable inference.

¶ 55. One could just as easily infer that Dr. Zimmer had nothing to do with Sarah's medical treatment until the morning of March 21, 1996. The record is insufficiently developed to dispositively resolve these issues. Absent the information from Drs. Beauchaine's and Stremski's depositions, the Hegartys could not have known "the identities of [their daughter's] health care providers and the nature of care provided to [her]." *Groom*, 179 Wis. 2d at 248.

¶ 56. "We have often stated summary judgment is a drastic remedy and should not be granted unless the material facts are not in dispute, no competing inferences can arise, and the law that resolves the issue is clear." *Lecus v. American Mut. Ins. Co. of Boston*, 81 Wis. 2d 183, 189, 260 N.W.2d 241 (1977). "Summary judgment is not to be a trial on affidavits and depositions." *Id.* Unfortunately, this has become just that – a trial on affidavits, depositions and medical records – a task better left to the jury. A significant jury question exists as to when the Hegartys actually knew or should have known the extent of Dr. Zimmer's involvement in the care of their daughter on March 20, 1996, and the

early morning of March 21, 1996. *See Ford Farms*, 145 Wis. 2d at 659. Accordingly, the trial court's grant of summary judgment was inappropriate.

*E. Respondeat Superior*

¶ 57. In its grant of summary judgment, the trial court determined that Affiliated Hospitals had no vicarious liability with respect to Dr. Beauchaine. Under the doctrine of respondeat superior, the trial court concluded that even though Dr. Beauchaine was employed by Affiliated Hospitals, she was not Affiliated Hospital's "servant" because it lacked the right to control the details of her work.

¶ 58. It is undisputed that Dr. Beauchaine was an employee of Affiliated Hospitals. The Hegartys contend that the terms "employee" and "servant" are used interchangeably and, therefore, once there is an employment relationship, respondeat superior liability follows as a matter of law. We disagree.

¶ 59. Under the doctrine of respondeat superior, the master is subject to liability for the torts of the servant committed while acting in the scope of his or her employment. RESTATEMENT (SECOND) OF AGENCY § 219(1) (1958). While the distinction between "employer" and "master," and "employee" and "servant," has become blurred, the distinction remains important. The supreme court has stated:

> In more recent times the words "employer and employee" have nearly supplanted the older term of "master and servant." This shift has been due no doubt to the vast increase in the employment of skilled persons in industry. The word "servant" has certain connotations which are distasteful to many persons . . . so that

176

it has come about that the terms "servant," "employee" and "agent" are often used interchangeably without regard to their strict legal meaning.

*Ryan v. Wisconsin Dep't of Taxation*, 242 Wis. 491, 496–97, 8 N.W.2d 393 (1943) (citation omitted).

¶ 60. The legal significance is great. A servant is not only "one employed to perform a service for another," but also "is subject to the other's control or right of control." *Kashishian v. Port*, 167 Wis. 2d 24, 33, 481 N.W.2d 277 (1992) (citations omitted). Wisconsin's civil jury instruction defining these terms adds further clarity to this distinction: "A 'servant' is one employed to perform service for another in his or her affairs and who, with respect to his or her physical conduct in the performance of the services, is subject to the other's control or right to control." Wis JI—Civil 4030. Therefore, the trial court applied the correct legal standard by distinguishing between an "employee" and a "servant."

¶ 61. Accordingly, since Affiliated Hospitals admits that Dr. Beauchaine was its employee, we must examine whether it had "the right to control the details of [her] work." *Madison Newspapers, Inc. v. Wisconsin Dep't of Revenue*, 228 Wis. 2d 745, 764, 599 N.W.2d 51 (Ct. App. 1999). "The right to control is the dominant test in determining whether an individual is a servant." *Pamperin v. Trinity Mem'l Hosp.*, 144 Wis. 2d 188, 199, 423 N.W.2d 848 (1988). "However, other factors are considered, including the place of work, the time of the employment, the method of payment, the nature of the business or occupation, which party furnishes the in-

strumentalities or tools, the intent of the parties to the contract, and the right of summary discharge of employees." *Id.* at 199.

¶ 62. Here, Affiliated Hospitals claims that it served primarily as "an administrative or bookkeeping function on behalf of hundreds of medical trainees." This statement ignores undisputed facts that suggest Affiliated Hospitals was more than an administrative entity: (1) Affiliated Hospitals employed Beauchaine under a written employment agreement; (2) Beauchaine received her paycheck and W2 from Affiliated Hospitals; (3) residents like Beauchaine were placed at hospitals through Affiliated Hospitals' graduate medical training program[6]; (4) Affiliated Hospitals provided Beauchaine with health, disability, life, and accidental death and

---

[6] The Medical College of Wisconsin "Housestaff Handbook" states:

> The Medical College of Wisconsin has affiliations with a number of health care institutions which cooperate in providing the clinical component of undergraduate medical education. [The Medical College] and these affiliated institutions also jointly conduct graduate medical education ... programs ... *through* the Medical College of Wisconsin Affiliated Hospitals. ...
>
> . . . .
>
> There are presently 72 residency and fellowship programs, conducted jointly by [the Medical College] and its affiliated institutions *through* [Affiliated Hospitals]. Each program is supervised and controlled by a program director, *who is an officer of [Affiliated Hospitals]*.

(Emphasis added).

The "INSTITUTION AGREEMENT Between Medical College of Wisconsin Affiliated Hospitals and Children's Hospital of Wisconsin" also refers to Affiliated Hospitals as the "Sponsoring Institution."

178

dismemberment insurance; (5) Affiliated Hospitals set Beauchaine's vacation schedule; (6) Affiliated Hospitals had the right to unilaterally terminate Beauchaine's contract and to fire her[7]; (7) the program directors, who are responsible for the evaluation and advancement of residents like Beauchaine, were subject to Affiliated Hospitals' policies and procedures governing staff education[8]; and (8) Affiliated Hospitals agreed to provide

[7] A document entitled "MEDICAL COLLEGE OF WISCONSIN AFFILIATED HOSPITALS GRADUATE MEDICAL TRAINING AGREEMENT" states, in relevant part: "Upon determination by the program director that trainee has not fulfilled his/her obligation under this Agreement, or that trainee will not successfully complete the training program, [Affiliated Hospitals] may unilaterally terminate this Agreement and dismiss the resident from the program by giving written notice of termination." (Emphasis added.) This document is signed by Dr. Beauchaine, the program director, as well as the executive director of Affiliated Hospitals.

[8] The "INSTITUTION AGREEMENT Between Medical College of Wisconsin Affiliated Hospitals and Children's Hospital of Wisconsin" states, in relevant part:

> [T]his documentation shall serve as the Institution Agreement between the Sponsoring Institution [Affiliated Hospitals] and participating hospitals. The administration of the Children's Hospital of Wisconsin agrees that Dr. David A. Lewis, the Program Director for the Residency Training Program of the Department of Pediatrics[,] shall continue to maintain administrative educational and supervisory responsibility for all pediatric and combined internal medicine pediatric housestaff while they are at the Children's Hospital of Wisconsin. Dr. Lewis shall also continue as administrative educational supervisory responsibility for all residents rotating from other programs on the general pediatric services. . . .
>
> . . . .
>
> [Affiliated Hospitals] policies and procedures that govern housestaff education shall be followed at the Children's Hospital of Wisconsin.

179

Dr. Beauchaine with legal defense and to indemnify her for any medical malpractice occurring within the scope of her employment.[9]

¶ 63. After citing these factors, the trial court concluded:

> I think the essential thing here . . . is the right to control the details of the work as a resident. [Affiliated

---

This document is signed by Dr. Lewis, Dr. Beauchaine's program director, Mark Anderson, the executive vice president of Children's Hospital, and Dr. Mahendr Kochar, the associate dean of graduate medical education at Affiliated Hospitals. Further, Dr. Lewis clarified his relationship with Affiliated Hospitals in his deposition:

> The training program directors all are a part of [Affiliated Hospitals'] committee of training program directors that administer[s] or that oversees all of the training programs, and that participates in the process of reaccredidation and evaluation of programs and evaluation of the overall well-being of residents in all of the [Affiliated Hospitals] programs.

[9] The "MEDICAL COLLEGE OF WISCONSIN AFFILIATED HOSPITALS GRADUATE MEDICAL TRAINING AGREEMENT" also states, in relevant part: "During the term of appointment, [Affiliated Hospitals] agrees . . . [t]o provide for legal defense and indemnification, within the limits of insurance in force, of trainee sued for medical malpractice occurring within the scope his or her assignment." However, the Medical College of Wisconsin "Housestaff Handbook" provides an exception to that general rule: "Unlicensed housestaff are insured under the general liability insurance policies of the affiliated institutions to which they are assigned." Therefore, while Affiliated Hospitals agreed to provide Dr. Beauchaine with legal defense and indemnification for any medical malpractice claims, ultimately, according to a separate agreement between Affiliated Hospitals and Children's Hospital, Children's Hospital actually provided Dr. Beauchaine with liability insurance because she was an unlicensed resident.

Hospitals] doesn't have that authority. I think that is where the attempt to impose vicarious liability runs into difficulty. . . . Because of that fact, the Court concludes that there is not vicarious liability here under the master/servant doctrine . . . and grants the motion for summary judgment of the defendant [Affiliated Hospitals].

¶ 64. In its respondeat superior analysis, the trial court relied on *Kashishian*. In *Kashishian*, the supreme court held that a hospital and a doctor did not have a master/servant relationship where the hospital "did not exercise control over the manner in which Dr. Port's cardiological services were provided." *Id.* at 34. Dr. Port was a cardiologist and the Director of Nuclear Cardiology within the Cardiovascular Disease Section of the Milwaukee Clinical Campus run by the University of Wisconsin Medical School. *Id.* at 29–30. Because of Dr. Port's "exercise of independent professional judgment" the court concluded that the hospital was not in a position to, and generally would not, exercise control over such an employee. *Id.* at 34.

¶ 65. The respondeat superior analysis in the current case involves vicarious liability of the medical program rather than the hospital, but there are other important distinctions. In *Kashishian*, no one challenged that "Dr. Port was an employee/servant of the University Physicians Milwaukee Clinical Campus Practice Plan, Inc." *Id.* at 33. However, in concluding that Dr. Port was not a servant of the hospital, the court noted:

Other factors also indicate that Dr. Port was not [the hospital's] servant at the time of the alleged malpractice. Dr. Port's paycheck came from the Milwaukee Practice Plan, a corporate entity controlled by the University. . . .[T]he Associate Dean of the University

181

of the University of Wisconsin Medical School, stated in an affidavit that . . . he held the direct responsibility to supervise the activities of the University faculty. . . . He further indicated that all final decisions on appointments and reappointments of the faculty . . . were made by the Dean of the University Medical School.

*Id.* at 34–35.

¶ 66. A number of undisputed facts establish that Affiliated Hospitals, a group similar to the corporate entity controlled by the university in *Kashishian*, had authority over Dr. Beauchaine's employment. First, "the method of payment of compensation, and the presence . . . of the right of the employer to summarily terminate the contract or hiring" establish that Affiliated Hospitals exercised control over Dr. Beauchaine. *See Scholz v. Indus. Comm'n*, 267 Wis. 31, 37, 64 N.W.2d 204 (1954).

¶ 67. In addition, in an affidavit, the executive director of Affiliated Hospitals stated that Dr. Beauchaine would be "performing medical services under the supervision and control of the program director." Although the program director is not an employee, Affiliated Hospitals admits that Dr. Lewis was "an officer of [Affiliated Hospitals]." Finally, Dr. Beauchaine signed a "medical training agreement" with Affiliated Hospitals stating that she would "comply with the administrative and professional policies, procedures, rules and regulations of [Affiliated Hospitals], The Medical College of Wisconsin, and the affiliated institution to which he/she is assigned." This agreement further noted that, "[t]hese policies may change from time to time in [Affiliated Hospitals'] sole discretion."

¶ 68. While Affiliated Hospitals may not have exercised exclusive or absolute control over her work, we note that the trial court failed to fully address a key

relationship relevant to the control element – whether Dr. Beauchaine was a loaned or borrowed servant. *See Borneman v. Corwyn Transp., Ltd.*, 212 Wis. 2d 25, 43, 567 N.W.2d 887 (Ct. App. 1997), *aff'd by Borneman v. Corwyn Transport, Ltd.*, 219 Wis. 2d 346, 580 N.W.2d 253 (1998). In *Borneman*, we applied the *Seaman* test to determine whether an individual is a loaned employee.[10] The *Seaman* test, first articulated by the supreme court in 1931, is as follows:

> The relation of employer and employee exists as between a special employer to whom an employee is loaned whenever the following facts concur: (a) Consent on the part of the employee to work for a special employer; (b) Actual entry by the employee upon the work of and for the special employer pursuant to an

---

[10] The *Seaman* test has been criticized by the supreme court as being difficult to apply because it is so fact oriented. *See, e.g., Borneman v. Corwyn Transp., Ltd.*, 219 Wis. 2d 346, 354–55, 580 N.W.2d 253 (1998); *Bauernfeind v. Zell*, 190 Wis. 2d 701, 710, 528 N.W.2d 346 (1995). In 1981, the Wisconsin legislature enacted WIS. STAT. §§ 102.29(6) and 102.01(2)(f), which apply to temporary help agencies. These statutes were intended to simplify the determination of whether an employee who was injured in the workplace may maintain a tort action against a temporary employer. *Gansch v. Nekoosa Papers, Inc.*, 158 Wis. 2d 743, 751, 463 N.W.2d 682 (1990). The *Bauernfeind* court, however, has clarified that "the legislature intended sec. 102.29(6), Stats., to replace the *Seaman* test only with respect to employees of a temporary help agency." *Bauernfeind*, 190 Wis. 2d at 712.

Those issues are not relevant here. This is not a "temporary help agency" case like *Gansch* involving the Worker's Compensation Act. In all other cases involving the loaned employee doctrine, the supreme court still utilizes the *Seaman* test and has declined to revise it. *See Borneman*, 219 Wis. 2d at 355. We thus apply the test originally enunciated in *Seaman*.

> express or implied contract so to do; (c) Power of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue.

*Id.* at 32 (citation omitted). The focus of the overall inquiry is "to determine whether a new employment contract was created by the parties." *Id.* at 33.

¶ 69. This determination is a key element in the present respondeat superior analysis because of "a well-established presumption relevant to the control element of the *Seaman* test." *Id.* at 43. This presumption states:

> In the absence of evidence to the contrary, there is an inference that the actor remains in his [or her] general employment so long as, by the service rendered another, he [or she] is performing the business entrusted to [them] by the general employer. There is no inference that because the general employer has permitted a division of control, [the employer] has surrendered it.

*Id.* at 43–44. "This inference has risen to the level of a legal presumption." *Id.* at 44. Affiliated Hospitals argues that it is not required to prove it loaned Dr. Beauchaine to a particular institution, nor was the trial court required to make a finding in that regard. We disagree.

¶ 70. Simply because Affiliated Hospitals allowed a division of this control, we cannot assume that it intended to relinquish it. *See generally Seaman Body Corp. v. Indus. Comm'n*, 204 Wis. 157, 235 N.W. 433 (1931). Where the trial court never fully considered the issue, the record is insufficient to overcome the presumption that Dr. Beauchaine remained in her general employment with Affiliated Hospitals. *See Borneman,*

212 Wis. 2d at 44. Affiliated Hospitals must overcome this presumption by showing that it relinquished full control of its servant. *See Edwards v. Cutler-Hammer*, 272 Wis. 54, 64, 74 N.W.2d 606 (1956).

■

¶ 71. The general employer may rebut the presumption by showing that it relinquished full control of its servant. *Id.* Therefore, once the plaintiffs have established a prima facie case that the general employer is the master, as the Hegartys have here, "the burden is on upon the general employer to establish not only that he loaned the servant but that he surrendered control and direction over the servant to the borrower." *Borneman*, 212 Wis. 2d at 44 (citation omitted).

¶ 72. As the trial court stated, "if it is not [Affiliated Hospitals] and it is not Children's [Hospital], then who is it?" Someone was Dr. Beauchaine's "master." Unlike the doctor in *Kashishian*, Dr. Beauchaine was not given full discretion in the "exercise of independent professional judgment." She was a first-year, unlicensed medical resident. In her deposition, Dr. Beauchaine stated that she could not perform any procedures, she was not authorized to call for a surgical consult, and was otherwise limited in her ability to write prescriptions and order procedures. This is not the unfettered discretion of the independent cardiologist in *Kashishian*.

¶ 73. While the record is not adequately developed on this point, it appears from the pleadings and excerpts of depositions that the residents in the program rotate from hospital to hospital. Therefore, while at Children's Hospital, Dr. Beauchaine was under the supervision of a number of people. While on the floor admitting patients, Dr. Beauchaine was supervised by the attending physician and a senior resident. However,

Dr. Beauchaine's day-to-day assignments, supervision and review were supervised by the Medical College through a pediatric faculty member. This faculty member, previously referred to as the program director, does not rotate from hospital to hospital, but is assigned to a specific hospital.

¶ 74. In Dr. Beauchaine's residency at Children's Hospital, her program director was Dr. David Lewis. Dr. Lewis stated in his deposition:

> The training program directors are a part of [Affiliated Hospitals'] committee of training program directors that administer or that oversees all the training programs, and that participates in the process of reaccredidation and evaluation of programs and evaluation of the overall well-being of residents in all of the [Affiliated Hospitals'] programs.

Although Dr. Lewis was an employee of the Medical College, as a program director, he did oversee and enforce Affiliated Hospitals' policies and procedures governing staff education. Additionally, as "an officer" of Affiliated Hospitals, Dr. Lewis was also apparently subject to Affiliated Hospitals' policies and procedures while at Children's Hospital pursuant to the "INSTITUTION AGREEMENT."

¶ 75. The residents, like Dr. Beauchaine, rotate from hospital to hospital. While at a hospital, a number of individuals "control the details of their work." One of these individuals being the program director who, as previously stated, is a member of Affiliated Hospitals' committee that oversees the residency program and is subject to the policies and procedures of Affiliated Hospitals.

¶ 76. More importantly, before a resident is assigned to a specific hospital or while waiting for an assignment, it appears that Affiliated Hospitals is the

186

sole employer and master. We conclude that the evidence, as set forth in the pleadings, was sufficient to create the presumption that Dr. Beauchaine was both an employee and a servant of Affiliated Hospitals. The trier of fact must determine whether Affiliated Hospitals intended to relinquish control to the hospital, the attending physician, or someone else.

¶ 77. We conclude that reasonable persons might disagree as to whether Dr. Beauchaine was a servant of Affiliated Hospitals and, if so, whether Affiliated Hospitals intended to relinquish full control to another institution. Resolving any doubts regarding a factual issue against the party moving for summary judgment, here Affiliated Hospitals, *see L.L.N. v. Clauder*, 209 Wis. 2d 674, 684, 563 N.W.2d 434 (1997), we conclude that summary judgment is inappropriate and a trial is necessary to resolve these issues, *see Preloznik*, 113 Wis. 2d at 116.

¶ 78. After examining the pleadings, affidavits, depositions, and other papers on file, we conclude that a genuine issue exists as to a number of material facts, and reasonable conflicting inferences may be drawn from the undisputed facts, therefore requiring a trial. *See Green Spring Farms*, 136 Wis. 2d at 315. Two significant jury questions have been presented: (1) at any time, was Dr. Beauchaine a servant of Affiliated Hospitals, *i.e.*, was she employed by Affiliated Hospitals and was she subject to Affiliated Hospitals' control or right to control; and, if so (2) did Affiliated Hospitals loan Dr. Beauchaine to another and surrender the right to control Dr. Beauchaine to that other institution or person? Accordingly, we reverse the trial court's grant of summary judgment as to Affiliated Hospitals' vicarious liability.

187

*By the Court.*—Orders affirmed in part; reversed in part and cause remanded.

¶ 79.　FINE, J. (*dissenting*). Judge Schudson and I agree with the lead opinion's resolution of the issues discussed in Section II A., B., and C. We also believe, however, that the lead opinion's discussion of the "discovery" issue in Section II D. would, if adopted, be a sea change in our law that would eliminate the requirement that injured plaintiffs exercise "reasonable diligence" in seeking to ascertain possible causes of their injuries, and would transmute the rule into one of discovery-in-fact. *See* Wis. Stat. § 893.55(1). Accordingly, Section 1 of this opinion is the opinion of the court on the discovery-rule issue. *See State v. Dowe*, 120 Wis. 2d 192, 194, 352 N.W.2d 660, 662 (1984).

¶ 80.　Judge Schudson joins in the lead opinion's resolution of the "*respondeat superior*" issue, discussed in Section II E. of that opinion. For the reasons set out in Section 2 of this opinion, I respectfully dissent from the majority's Section E.

1. *The "discovery" rule.*

¶ 81.　We start with the paradigm that although summary judgment may not be granted unless there are no disputed issues of material fact, and, therefore, a party is entitled to judgment as a matter of law, Wis. Stat. Rule 802.08(2), the party with the burden of proof on an element in the case can only avoid summary judgment if that party submits evidentiary material "set[ting] forth specific facts," Wis. Stat. Rule 802.08(3), that raise genuine issues as to that element. *Transportation Ins. Co. v. Hunzinger Constr. Co.*, 179 Wis. 2d 281, 290–292, 507 N.W.2d 136, 139–140 (Ct. App. 1993).

If the party with that burden does not show that there is a genuine issue of material fact with respect to an element, summary judgment "shall" be granted on that element. RULE 802.08(2).

¶ 82. As the lead opinion recognizes, we review *de novo* a trial court's determination whether summary judgment is required. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–316, 401 N.W.2d 816, 820–821 (1987). Here, the trial court, a careful, insightful judge, determined that the plaintiffs did not exercise reasonable diligence in attempting to timely determine the role of Mary Jo Zimmer, M.D., in the tragic death of Sarah M. Hegarty. On Judge Schudson's and my *de novo* analysis, we agree.

¶ 83. As material to the issue of whether the statute of limitations ran in connection with the plaintiffs' claims against Dr. Zimmer, WIS. STAT. § 893.55(1) requires that a medical-malpractice action be commenced:

(a) Three years from the date of injury, or

(b) One year from the date the injury was discovered or, in the exercise of reasonable diligence should have been discovered, except that an action may not be commenced under this paragraph more than 5 years from the date of the act or omission.

The focus is on whether the plaintiffs exercised reasonable diligence in ascertaining Dr. Zimmer's role in the care and treatment of Sarah Hegarty while Sarah Hegarty was at Children's Hospital.

¶ 84. The reasonable-diligence test is an objective one. *Carlson v. Pepin County*, 167 Wis. 2d 345, 353, 481 N.W.2d 498, 501 (Ct. App. 1992). Additionally, what a

189

lawyer retained by a plaintiff knows is imputed to that plaintiff. *Groom v. Professionals Ins. Co.*, 179 Wis. 2d 241, 250 n.3, 507 N.W.2d 121, 125 n.3 (Ct. App. 1993). This means that what the Hegartys *actually* knew is not dispositive. Rather, assuming lack of personal knowledge, the issue is what in the exercise of reasonable diligence either the Hegartys or their lawyers *should have* known. *Carlson*, 167 Wis. 2d at 353, 481 N.W.2d at 501.

¶ 85. Embedded in the duty to exercise reasonable diligence is the duty to inquire. *Doe v. Archdiocese of Milwaukee*, 211 Wis. 2d 312, 319, 340, 565 N.W.2d 94, 96, 105 (1997) ("Plaintiffs may not ignore means of information reasonably available to them, but must in good faith apply their attention to those particulars which may be inferred to be within their reach.") (recognizing "duty to inquire") (affirming trial courts' grants of summary judgment that plaintiffs' claims were barred by the statute of limitations); *Spitler v. Dean*, 148 Wis. 2d 630, 638, 436 N.W.2d 308, 311 (1989) ("Plaintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach."). The lead opinion ignores this duty.

¶ 86. In our view, plaintiffs, "in the exercise of reasonable diligence should have . . . discovered," Wis. Stat. § 893.55(1)(b), Dr. Zimmer's role in Sarah Hegarty's death more than one year before December 20, 1999, (when they filed their amended complaint naming Dr. Zimmer as a defendant for the first time) at the very latest. December 19, 1998, is thus the critical date. This is what the plaintiffs knew well before December 19, 1998:

■

- Dr. Zimmer was Sarah Hegarty's personal physician before Sarah Hegarty's admission to Children's Hospital that is the subject of this action;

- Before Sarah Hegarty's admission to Children's Hospital that is the subject of this action, Dr. Zimmer attempted to treat Sarah Hegarty for the ailment from which she ultimately died;

- Dr. Zimmer's attempted treatment of Sarah Hegarty before her admission to Children's Hospital that is the subject of this action was unsuccessful, in large measure—if not wholly—because of a misdiagnosis of Sarah Hegarty's ailment as irritable bowel syndrome;

- Sarah Hegarty's admission to Children's Hospital that is the subject of this action was on March 20, 1996, at 4:29 p.m., and Dr. Zimmer is listed on the admitting form as Sarah Hegarty's primary physician;

- Dr. Zimmer arrived at Children's Hospital at 7:30 a.m. on March 21, 1996;

- At 8:08 p.m., on March 20, 1996, Angela Beauchaine, the resident examining Sarah Hegarty, completed the Children's Hospital form headed "History and Physical Examination" (uppercasing omitted);

- At 8:15 a.m., on March 21, 1996, Dr. Zimmer signed as the "ATTENDING Physician" the "History and Physical Examination" form filled out by Dr. Beauchaine the previous evening;

- The "History and Physical Examination" form filled out by Dr. Beauchaine and countersigned

191

by Dr. Zimmer as the "ATTENDING Physician" clearly indicates that Dr. Beauchaine is a "RESIDENT Physician";

- Dr. Zimmer's telephone number is written in what appears to be Dr. Beauchaine's handwriting at the top of the "History and Physical Examination" form;

- The Children's Hospital "Emergency Service Admission Orders" (uppercasing omitted) form for Sarah Hegarty dated March 20, 1996, recites: "Admit to: [X] PRIVATE PATIENT Dr. Zimmer (Notified and accepted patient)" (all text but the word "Zimmer" is pre-printed);

- The Children's Hospital "Patient Admission Information" (uppercasing omitted) form for Sarah Hegarty dated March 20, 1996, and bearing a time imprint of 7:47 p.m. contains the following: "ATT1 ZIMMER, MARY JO" and also lists Dr. Zimmer as Sarah Hegarty's primary physician;

- The Children's Hospital "Progress Notes" (uppercasing omitted) form has twenty-six lines of a handwritten entry, dated March 21, 1996, at 8:15 a.m., by Dr. Zimmer of substantive medical matters pertaining to Sarah Hegarty's care and treatment;

- The Children's Hospital "Progress Notes" form with entries made by Dr. Beauchaine at 12:44 p.m. on March 21, 1996, which recounts Sarah Hegarty's condition, records that Sarah Hegarty was "reevaluated between 630 & 700 this am." These entries by Dr. Beauchaine were countersigned by Dr. Zimmer. A separate note on that form in Dr. Zimmer's handwriting and signed by

192

her, but without the time noted, records that
Sarah Hegarty was transferred to a surgical
unit;

• In April of 1997, the plaintiffs' lawyers sought
Sarah Hegarty's medical records, not only from
Children's Hospital, but also from Dr. Zimmer's
office;

• There is no evidence in the record that the
documents that the plaintiff's lawyers sought
from Children's Hospital and from Dr. Zimmer's
office were not timely received;

The original December 18, 1998, complaint alleged that
the defendants named in that complaint, including Dr.
Beauchaine, "failed to have a physician see [Sarah He-
garty], after being seen in the Emergency room, from the
time she was admitted to Children's Hospital of Wiscon-
sin on March 20, 1996, at approximately 4:15 p.m., until
approximately 8:30 a.m., on March 21, 1996." The origi-
nal complaint also alleged that Sarah Hegarty "coded at
1:00 p.m. and she was emergently [*sic*] rushed to surgery
at approximately 2:45 p.m. on March 21, 1996." The
complaint alleged that "[t]here was an approximate
22–hour delay from the time of Sarah Hegarty's hospital
admission to the time of surgery, when the standard of
care required that she be seen by a physician within a
short period of time after admission from the emergency
room." As we have seen, a note recording Sarah
Hegarty's transfer to surgery on March 21, 1996, was
made by Dr. Zimmer in her handwriting.

¶ 87. The December 20, 1999, complaint repeats
in substantially the same language quoted in the pre-
ceding paragraph how the defendants named in that

193

new complaint, this time including Dr. Zimmer, were negligent:

> That Sarah M. Hegarty sustained the described injuries and damages that ultimately resulted in her death as a result of the negligence of the defendants who failed to have a licensed physician see her, after being seen in the Emergency Room, from the time she was admitted to Children's Hospital of Wisconsin on March 20, 1996, at approximately 7:20 p.m., until approximately 8:15 a.m., on March 21, 1996. Sarah Hegarty subsequently coded at approximately 11:30 a.m. and she was emergently [*sic*] rushed to surgery at approximately 2:45 p.m. on March 21, 1996. There was an approximate 22–hour delay from the time of Sarah Hegarty's emergency admission to the time of surgery, when the standard of care required that she be seen by a physician within a short period of time after admission from the emergency room.

Although it is true, as the lead opinion opines, that there are *some* facts in dispute, none of those disputed facts raise a genuine issue affecting the grant of summary judgment. Simply put, the medical records that were available to the plaintiffs and their lawyers revealed *extensive involvement* by Dr. Zimmer during what both the 1998 complaint, which did not name Dr. Zimmer, and the 1999 complaint, which did name Dr. Zimmer, reference as the critical "22–hour delay." At the very least, these records, combined with what both the plaintiffs and their lawyers knew about Dr. Zimmer's involvement in the care and treatment of Sarah Hegarty before her admission to Children's Hospital on March 20, 1996, were enough to trigger the duty to inquire: Again, "[p]laintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach." *Spitler*, 148

Wis. 2d at 638, 436 N.W.2d at 311. But this is precisely what the lead opinion would approve.

¶ 88. Part of the lead opinion's rationale is founded upon *Jandrt v. Jerome Foods, Inc.*, 227 Wis. 2d 531, 597 N.W.2d 744 (1999), which upheld the trial court's determination that the continuation, but not the filing, of a toxic-tort action was frivolous. *Id.*, 227 Wis. 2d at 562, 573, 597 N.W.2d at 760, 764. There are two problems with the majority's reliance on *Jandrt*. First, *Jandrt* was decided in July of 1999, and, therefore, could not have affected either the plaintiffs' decision not to add Dr. Zimmer to the December, 1998 complaint, or whether they exercised reasonable diligence in not discovering Dr. Zimmer's role in the care and treatment of Sarah Hegarty prior to December 19, 1998. *See Groom*, 179 Wis. 2d at 251–252 n.6, 507 N.W.2d at 125 n.6 (affidavit had no bearing on what plaintiff reasonably should have known before affidavit was filed).

¶ 89. Second and more significant, *Jandrt* recognized that an approaching statute-of-limitations deadline affects whether the commencement of an action is reasonable. *Jandrt*, 227 Wis. 2d at 560, 597 N.W.2d at 759 ("[T]he amount of time an attorney has to investigate a claim is one consideration that shapes the objective standard for determining whether an attorney's inquiry was reasonable."). Here, the looming expiration of the statute of limitations in March of 1999, when added to all that the plaintiffs and their lawyers knew by that time would have made filing an action the prudent or, to paraphrase Wis. Stat. § 893.55(1)(b), the reasonably diligent, thing to do. Indeed, *even by the plaintiffs' own rationale,* namely, that they needed to take Dr. Zimmer's deposition before they could ascertain the true extent of her involvement in Sarah Hegarty's care, plaintiffs could have easily ascertained all they needed to

know by the March 21, 1999, statute-of-limitations deadline. Once they filed their initial complaint in December of 1998, they could have, and, we submit, in light of all of Dr. Zimmer's fingerprints all over Sarah Hegarty's care and treatment, should have, taken Dr. Zimmer's deposition well in-advance of the March 21, 1999, deadline. *See* WIS. STAT. RULE 804.05(1) ("After commencement of the action . . . *any* party make take the testimony of *any* person . . . by deposition upon oral examination.") (emphasis added). That they did not is hardly prudence; it is hardly "reasonable diligence." We affirm the trial court's dismissal of the plaintiffs' claims against Dr. Zimmer as being barred by the statute of limitations.

## 2. *Respondeat superior.*

¶ 90. I agree with the majority's analysis and conclusion that "employee" and "servant" are not synonymous for *respondeat superior* purposes. Unlike the majority, however, I do not agree that any evidentiary material that the plaintiffs have submitted, or that the majority recounts, raises a genuine issue of material fact as to whether Dr. Beauchaine was a "servant" of Medical College of Wisconsin Affiliated Hospitals in connection with her work at Children's Hospital. All that the extensive documentation and other evidentiary material in the record shows is that Affiliated Hospitals was a clearing house, with the additional rights to: 1) set policies that would be enforced *by others,* and 2) terminate a resident's participation if those supervising the resident reported information that made termination appropriate. Nothing the majority recounts shows

196

anything more—there are no *genuine* issues of *material* fact that need to be tried. Accordingly, I respectfully dissent from Section 2 E. of the majority's opinion.